[No. 31535-8-I.   Division One.   March 28, 1994.]

GEN LO, ET AL, *Respondents*, v. HONDA MOTOR COMPANY, LTD., ET AL, *Defendants*, NORTHWEST HOSPITAL, INC., ET AL, *Petitioners*.

*Peter M. Fabish, Katharine Witter Brindley, William R. Hickman,* and *Reed McClure,* for petitioners.

*Kenneth B. Dore; George Kargianis* and *Kargianis & Osborn; Charles K. Wiggins, Catherine Wright Smith,* and *Edwards, Sieh, Wiggins & Hathaway, P.S.,* for respondents.

KENNEDY, J. — Petitioners Northwest Hospital and Drs. Ou and Neighbor sought and were granted discretionary review of the trial court's denial of their motions for sum-

mary judgment. The hospital, speaking for all the Petitioners, contends that the medical negligence claims of the Respondents Lo are timebarred in that Elizabeth Lo (Lo), the mother of the minor child Brian Lo (Brian), and her attorney-representative reasonably should have discovered all of the facts giving rise to Brian's claim for injuries occurring during birth, within 3 years after his date of birth.

Finding genuine issues of material fact concerning due diligence in discovering medical omissions alleged to have caused Brian's afflictions, we affirm and remand for trial.

### FACTS

On January 14, 1988, when Elizabeth Lo was $5^1/2$ months pregnant with her son Brian, she got into her Honda automobile and started the engine. The vehicle suddenly accelerated uncontrollably. Unable to stop the automobile with her brakes alone, Lo thrust the gear-shift lever backward and forward in an effort to kill the engine. Before the engine died, Lo's body was thrashed about violently by the forward and backward jerking of the vehicle. Within 24 hours of this incident Lo experienced vaginal bleeding and premature uterine contractions. She was admitted to the hospital, held overnight and discharged the following day. She was counseled to remain in bed.

One month later, February 15, 1988, Lo returned to the hospital in premature labor. She arrived at the emergency room at about 1 a.m., where she remained for over an hour. Dr. Neighbor examined her while she was in the emergency room. At 2:15 a.m. Lo, whose cervix was fully dilated, was admitted to the delivery room. At 2:38 a.m. her membranes ruptured and she lost the amniotic fluid. Brian presented in a footling breach position with a prolapsed umbilical cord, meaning that the cord had become compressed during labor, cutting off the baby's blood (oxygen) supply. Lo, who had had two previous Caesarean section deliveries, was then rushed into an operating room for an emergency Caesarean delivery. Lo's obstetrician, Dr. Ou, who had arrived at the hospital 8 minutes before Lo's water broke, performed the surgery.

Brian's APGAR scores were low and his blood pressure was very low. Brian was in serious respiratory distress at his birth and he immediately was placed in the care of a high-risk team. He was stabilized before being transferred to Children's Orthopedic Hospital, where he subsequently was diagnosed as a spastic quadriplegic with cerebral palsy.

Lo maintains that, following Brian's birth, she repeatedly asked Brian's pediatricians how Brian came to be so severely afflicted. In an affidavit filed in opposition to the summary judgment motions Lo stated that she was consistently told, in response to these inquiries, that "there really is no explanation for such an occurrence, . . . in a small percentage of cases these things just happen."

Lo became convinced in her own mind that Brian's afflictions were related to his premature birth, which she in turn believed to have been caused by the thrashing about she received in her Honda automobile a month before Brian's premature birth. In November 1989, Lo retained attorney George Kargianis and asked him to pursue the possibility that the automobile incident caused or contributed to Brian's premature birth. Kargianis commenced gathering medical records.

In September 1990, the Kargianis firm sent letters to several of Brian's physicians, enclosing various medical records and seeking their opinions about what caused Brian's afflictions. The following letter is representative of the inquiries made at that time:

> Our firm is representing Mrs. Elizabeth Lo, Brian's mother, in a lawsuit against the Honda Motor Company. . . . [S]he is alleging that a sudden acceleration accident which occurred . . . approximately one month before Brian's birth . . . caused his premature birth and effected the adverse outcome of this pregnancy.
>
> . . . *[We request] your opinion about the causation of Brian's prematurity and cerebral palsy. . . .*
>
> . . . .
>
> After you have had an opportunity to review [the enclosed medical] records, *we would appreciate a brief telephone conversation with you to discuss your opinions about the causation of Brian's prematurity on February 15, 1988, and whether or not it could have been related to the trauma suffered by his mother in*

*the car accident* of January 14, 1988. Could there have been some sort of placental damage or displacement during that incident?

(Italics ours.)[1]

None of the doctors who responded to these letters opined that the automobile incident caused or contributed to Brian's premature birth or his afflictions.[2] None of the doctors volunteered an opinion that medical errors or omissions may have caused or contributed to Brian's condition. On September 14, 1990, Dr. Nora Davis, Brian's physician at Children's Orthopedic Hospital, opined that Brian's condition resulted from perinatal asphyxia due to the prolapsed umbilical cord, which cord became compressed during Brian's delivery.

In April 1991, the Kargianis firm contacted Professor Zane Brown, M.D., of the University of Washington. Dr. Brown at first agreed to evaluate Brian's case. However, a month later, Dr. Brown returned the package of medical records, stating:

> I am returning an unopened file that you sent to me about one month ago. Though I agreed to review the case when I talked to you over the telephone, I am quite uncomfortable evaluating cases for plaintiffs within the Puget Sound region. Even though the primary event in question may be automobile or other physical trauma, subsequent care and outcome will inevitably involve local physicians and hospitals. I hope that keeping this file unopened for a month has not inconvenienced you. If I can be of any help in locating a perinatologist that would review the record, please do not hesitate to call.[3]

---

[1]The hospital argues that the duty of due diligence required the Kargianis firm not only to ask the physicians' opinions about the cause of Brian's afflictions but also to inquire *specifically* whether a cause could have been medical malpractice.

[2]On January 10, 1991, just prior to the third anniversary of the automobile incident, and notwithstanding the lack of medical opinion as to proximate cause, Lo commenced the present action solely as a product liability lawsuit against Honda. After surviving Honda's motion for summary judgment, Lo eventually settled the product liability claim for $62,500.

[3]We believe that a rational trier of fact could conclude that this letter contains at least a "hint" that Lo might wish to investigate the possibility of medical malpractice. Lo amended the products liability complaint, adding the cur-

In July 1991, the Kargianis firm sought an evaluation from Dr. Stephen Glass, who concurred with Dr. Nora Davis as to the cause of Brian's injuries. Dr. Glass did not offer an opinion on the subject of medical negligence.

In or about September 1991, by which time Brian was $3^1/2$ years old, the Kargianis firm contacted Dr. Michael Sherman of the UCLA Medical Center asking him to evaluate Brian's claim. Shortly thereafter Dr. Sherman responded. He opined that negligent acts or omissions of Drs. Neighbor, Ou and the obstetrics nursing staff at Northwest Hospital more probably than not caused or contributed to Brian's maladies. These acts or omissions (mostly omissions) included (1) failing to order an ultrasound examination to determine the exact position of the fetus when Lo arrived at the emergency room in premature labor and in light of Lo's previous history of delivering only by Caesarean; (2) failing to begin preparing immediately for a possible Caesarean delivery instead of waiting until after Lo's water broke before deciding to proceed to surgery, in view of the heightened possibility of a prolapsed umbilical cord due to Brian's footling breach position and imminent premature birth; (3) failing to administer medications to delay or reduce the intensity of the premature contractions, thus reducing the risk of cord prolapse; (4) utilizing unacceptable and ineffective manual techniques in an attempt to relieve the pressure on the prolapsed cord; and (5) failing to timely treat Brian with oxygen and medications to enhance his blood flow.[4]

From the record, it appears that Dr. Sherman was at least the seventh physician who was asked to express an opinion as to the cause of Brian's cerebral palsy and the first to opine that medical malpractice was a cause of the condition. Within 5 months of receiving Dr. Sherman's opin-

rent medical negligence claims in February 1992, within 1 year of receiving this letter from Dr. Brown.

[4]Petitioners and their medical expert witnesses vigorously dispute each of these contentions. The defense experts opine that the prolapsed cord and Brian's respiratory distress and resulting neurodevelopmental handicaps could not have been controlled or prevented and that Brian received exemplary care.

ion, Lo's attorneys amended Lo's complaint against Honda to add Northwest Hospital and Drs. Ou and Neighbor as additional Defendants. This was done on February 28, 1992, when Brian had just passed his fourth birthday.

On September 11, 1992, the trial court denied the hospital's and doctors' motions for summary judgment of dismissal of Lo's claims. In January 1993, this court granted discretionary review. Oral argument was heard in September 1993.

## Discussion

## I

### The Statute of Limitations

RCW 4.16.350(3) provides that civil actions for damages for injury occurring as the result of health care

> shall be commenced within three years of the act or omission alleged to have caused the injury or condition, or one year of the time the patient or his representative discovered or reasonably should have discovered that the injury or condition was caused by said act or omission, whichever period expires later, except that in no event shall an action be commenced more than eight years after said act or omission[.]. . .
>
> . . . Any action not commenced in accordance with this section shall be barred.[5]

---

[5]The statute also provides that

> notwithstanding RCW 4.16.190, the knowledge of a custodial parent or guardian shall be imputed to a person under the age of eighteen years, and such imputed knowledge shall operate to bar the claim of such minor to the same extent that the claim of an adult would be barred under this section.

The amended complaint includes Brian's claim for his injuries as well as his parents' claims for their damages. Lo argues that even if her claim as a parent were barred because she "reasonably should have discovered" the elements of her own claim before Brian's third birthday, Brian's separate claim would not be barred because only a parent's "knowledge" and not what he or she "should have discovered" is to be imputed to a minor child, by the terms of this statute. Although this question of statutory interpretation was not before the trial court, Lo asks that we decide the question now, in the interests of justice and judicial economy. However, as late as oral argument for this review, Lo was raising new arguments on this issue that have not been briefed and to which the Petitioners have not had opportunity to respond. This issue is too important to be decided without full briefing by both parties. Accordingly, we must decline to decide the issue now.

RCW 4.16.350 contains two alternative limitations periods: (1) the action must either be commenced within the standard 3-year limitation period (here, within 3 years of Brian's birth); or (2) within 1 year of such time as the patient or his or her representative "discovered or reasonably should have discovered that the injury or condition was caused by [the] act or omission, whichever period expires later". RCW 4.16.350(3); *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 864 P.2d 921 (1993).

> Discovery rules such as RCW 4.16.350's require a claimant to "use due diligence in discovering the basis for the cause of action". *Allen v. State*, 118 Wn.2d 753, 758, 826 P.2d 200 (1992) (citing *Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 772, 733 P.2d 530 (1987)). The question of when a patient or representative reasonably should have discovered the injury was caused by medical negligence is normally an issue of fact. *Honcoop v. State*, 111 Wn.2d 182, 194, 759 P.2d 1188 (1988); *Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 510, 598 P.2d 1358 (1979). The key consideration under the discovery rule is the factual, as opposed to the legal, basis of the cause of action. *Allen*, 118 Wn.2d at 758.

*Adcox*, 123 Wn.2d at 34-35.

## II
### Petitioners' Arguments

The hospital and physicians ask this court to rule as a matter of law that Lo and her attorneys were placed on inquiry notice that medical malpractice could have caused Brian's condition at any one of three points in time: (1) as to Lo, on the date of Brian's birth, in that Lo knew from that day forward that Brian suffered birth asphyxia; (2) as to Lo's attorneys, from November 1989, or as soon thereafter as they were able to review the medical records, which records show birth asphyxia; (3) as to Lo's attorneys, at the very latest from and after September 14, 1990 ($2^1/_2$ years after Brian's birth), when Dr. Nora Davis told them that Brian's condition resulted from perinatal asphyxia, due to the prolapsed umbilical cord, which cord became compressed during labor immediately prior to the Caesarean delivery. Thus, the Petitioners ask this court to conclude as

a matter of law that the limitations period expired, if not on February 15, 1991 (3 years after Brian's birth), then at the very latest no later than on September 14, 1991 — 1 year after Dr. Nora Davis told Lo's attorneys that Brian's condition resulted from birth asphyxia due to the compressed umbilical cord.

This is tantamount to an argument that the fact of birth asphyxia in and of itself gave rise to a duty to inquire whether a cause of the birth asphyxia might be medical malpractice. Moreover, by the Petitioners' position the duty to specifically inquire about the possibility of medical malpractice must arise as a matter of law regardless of whether the patient has been told by all of the treating physicians that "in a small percentage of cases these things just happen". Finally, the Petitioners' argument presupposes that the duty to inquire specifically about the possibility of medical malpractice must arise as a matter of law even where there is another facially logical explanation, here the incident with the Honda automobile, which was followed immediately by vaginal bleeding and premature contractions and which was followed, 1 month later, by premature labor and delivery.

The Petitioners' reasoning culminates in the presumption that because the fact of an adverse medical outcome, here birth asphyxia, places a claimant on inquiry notice as a matter of law that medical malpractice may be a causative factor, the knowledge that the claimant presumably would have acquired, if he or she had timely made the necessary inquiry, must be imputed to the claimant as a matter of law.

The Petitioners rely most heavily upon the following cases: *Allen v. State*, 118 Wn.2d 753, 758, 826 P.2d 200 (1992) (discovery rule postpones running of statute of limitations only until the time when a plaintiff, through the exercise of due diligence, should have discovered the factual basis for the cause of action, even if actual discovery of the legal basis came later); *Zaleck v. Everett Clinic*, 60 Wn. App. 107, 114, 802 P.2d 826 (1991) (patient whose thumb became numb from shot of cortisone injected into his wrist, and who

was told by his physician at the time of the injection that the needle might have hit a nerve, knew or should have known as a matter of law the fact of his injury and its cause and failed to exercise due diligence when all that he had to do, in order to discover physician's negligence, was to talk to a lawyer or another physician); *Gevaart v. Metro Constr., Inc.*, 111 Wn.2d 499, 502, 760 P.2d 348 (1988) (plaintiff who fell on a sloping step and knew that the step was sloped was under a duty of due diligence to discover the legal basis of her claim which was a builder's violation of the building code, which violation caused the step to slope; failure to discover the underlying causation within 3 years of her fall barred the claim); *Richardson v. Denend*, 59 Wn. App. 92, 95-97, 795 P.2d 1192 (1990) (legal malpractice claims based on errors or omissions during the course of litigation accrue no later than the date of entry of an adverse judgment; client is charged with knowledge as a matter of law, or at least is put on notice that attorney may have committed malpractice, by virtue of the adverse judgment), *review denied*, 116 Wn.2d 1005 (1991);[6] and finally, *In re Estates of Hibbard*, 118 Wn.2d 737, 749-50, 752, 826 P.2d 690 (1992) (application of discovery rule historically has been limited to claims in which plaintiffs could not immediately have known of the fact of their injuries due to professional malpractice; application of rule extended by *Hibbard* court to claims in which plaintiffs could not immediately know of the *cause* of their injuries; cause of action accrues when claimant knew or in the exercise of due diligence should have known all the essential elements of a cause of action: duty, breach, causation and damages).

Petitioners also argue that *Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 511, 598 P.2d 1358 (1979) is no longer good law in that it interpreted the pre-1976 version of RCW

---

[6]Petitioners argue that the only difference between a medical malpractice claim such as Lo's and a legal malpractice claim arising during the course of litigation is the professional title of the defendant — a distinction without a difference. Lo argues that litigation negligence by an attorney falls under a common law exception to the normal discovery rule, based on a legal fiction that the negligence becomes embodied in the adverse judgment. We agree with Lo.

4.16.350. In *Ohler*, the 22-year-old claimant knew that the cause of her blindness was too much oxygen in her incubator but there was a factual issue as to whether she knew she received too much oxygen because of a breach of the medical standard of care. Held: her claim was not time barred as a matter of law. *Ohler*, 92 Wn.2d at 510-11.

## III

### Lo's Arguments

Lo relies primarily upon the case of *North Coast Air Servs., Ltd. v. Grumman Corp.*, 111 Wn.2d 315, 759 P.2d 405 (1988) in which our Supreme Court rejected arguments bearing a striking similarity to the arguments raised by Petitioners, including an argument that by adopting RCW 7.72.060(3)[7] the Legislature clearly intended to overrule *Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 598 P.2d 1358 (1979).

Lo's brief for this review incorporates the Supreme Court's analysis of legislative intent contained in *Grumman*, 111 Wn.2d at 319-28, adapting it to the medical malpractice context and RCW 4.16.350. That being so, we need not repeat Lo's arguments here.

## IV

### Analysis

We find *Grumman* to be highly persuasive if not controlling of most of the issues in this review.[8] In *Grumman*, a pilot was killed in the crash of an amphibious airplane in March 1974. An inquest was held and the authorities attributed the crash to pilot error. In May 1984, the pilot's father learned that an identical aircraft had almost stalled on takeoff, allegedly because of a defect in the elevator

---

[7]RCW 7.72.060(3) is the products liability statute of limitations: "[N]o claim under this chapter may be brought more than three years from the time the claimant discovered or in the exercise of due diligence should have discovered the harm and its cause." Laws of 1981, ch. 27, § 7.

[8]At oral argument for this review, the hospital's counsel candidly admitted that it is difficult to reconcile the Petitioners' position with the decision in *Grumman*. We commend this candor. It reflects the high professional standard required of an officer of the court.

control assembly. The father learned of other incidents in which planes of this model had crashed following a stall. The father alleged that only then did he realize that the 1974 crash which killed his son might have resulted from a similar defect. He began an investigation and allegedly located a piece of the plane's wreckage which contained a defective elevator linkage. He then filed a products liability wrongful death suit. *Grumman*, 111 Wn.2d at 317-18.

Defendant moved for summary judgment, contending that the suit was time barred under RCW 7.72.060(3).[9]

The defendants reasoned that the action accrued at the time of the crash in 1974, in that the plaintiff knew at that time of the harm, the death of the pilot, and its immediate cause, the crash of the plane. Plaintiff responded that the statute requires a causal connection between a product and an injury, and that whether a claimant has exercised due diligence in discovering that causal connection is a factual question, in cases where such connection is not immediately obvious.

Our Supreme Court agreed with the plaintiff, *Grumman*, 111 Wn.2d at 319, concluding that the action did not accrue until the plaintiff knew or with due diligence should have known that the cause of the crash may not have been pilot error after all, but rather a defect in the product. The court rejected the defendant's contention that knowledge should be imputed as a matter of law from the known happening of the traumatic event. *Grumman*, 111 Wn.2d at 322.[10] What the father knew or should have known about the cause of the harm was an unresolved issue of fact. *Grumman*, 111 Wn.2d at 328.

---

[9]The father's claim was filed in federal district court. That court certified the issue to the Washington Supreme Court. *Grumman*, 111 Wn.2d at 317.

[10]We need not repeat the Supreme Court's reasoning with respect to *Ohler* and the legislative history of RCW 7.72.060(3). Suffice it to say that a similar analysis of the legislative history of RCW 4.16.350 leads us to the same conclusion as reached by the Supreme Court in *Grumman*. The Legislature intended to modify but not to overrule *Ohler* and its progeny, in the context of medical malpractice claims. *Cf. Grumman*, 111 Wn.2d at 325-26.

Comparing the defendants' arguments in *Grumman* to those of the hospital and physicians in this review, we note that Petitioners assert that (1) Lo knew of the injury to Brian (pilot died); (2) Lo knew the immediate cause, the prolapsed cord leading to birth asphyxia (plane crash killed pilot); (3) Lo was placed on inquiry notice by the fact of the traumatic event, birth asphyxia, and was under a duty of due diligence to inquire whether medical malpractice may have been a cause, regardless of the existence of another facially reasonable explanation, the Honda incident, and regardless of being told by Brian's physicians that sometimes these things just happen (pilot's father placed on inquiry notice by the fact of the crash and was under a duty of due diligence to inquire whether product defect may have been a cause, regardless of the existence of another facially reasonable explanation, pilot error).

■ The Supreme Court rejected this reasoning in *Grumman*, and so do we. We decline to hold as a matter of law that the fact of a traumatic medical event (birth asphyxia) and knowledge of its immediate cause (prolapsed cord) equates with notice (imputed knowledge) that the injury was caused by a medical error or omission. Like the products liability statute of limitation, RCW 4.16.350 provides that the claimant should have a reasonable opportunity to discover that the injury was caused by an act or omission. *See also In re Estates of Hibbard*, 118 Wn.2d at 750 ("Application of the [discovery] rule is extended to claims in which plaintiffs could not immediately know of the cause of their injuries").

This does not end our analysis, however, for there is one compelling distinction between the due diligence facts in *Grumman* and those in the instant matter: Lo hired an attorney to investigate whether the cause of Brian's injury could be the car accident, well before the expiration of the normal 3-year limitation period. There was no such factor in *Grumman*.

■ Thus, the second focus of the Petitioners' challenge to Lo's claim that she exercised due diligence in discovering

the factual basis for this cause of action is not on Lo but on the Kargianis law firm. The inference is that if the mother of this tragically injured child may be excused for failing to inquire promptly and specifically whether the doctors and hospital staff who assisted in Brian's delivery were negligent in that process, her attorneys must be held to a higher standard of due diligence. We are asked to rule as a matter of law that the Kargianis law firm, in its capacity as Lo's legal representative, failed to exercise that degree of due diligence which is required of a claimant's attorney-representative by RCW 4.16.350 and to rule in turn that such failure of due diligence must be imputed to Lo.[11]

The Petitioners argue that it "strains reason to suggest that it was reasonable" for Lo's "sophisticated counsel" to take from November 1989 (when the Kargianis firm was hired) to the fall of 1991 (when Dr. Sherman was first contacted) to "hit upon the idea that the physicians who delivered Brian might be legally responsible for an event that occurred during delivery", birth asphyxia. Br. of Petitioners, at 21.

This argument spills over into the realm of the applicable standard of legal care to be applied in measuring an attorney-representative's due diligence for purposes of RCW 4.16.350. This, of course, is not a legal malpractice case, which may be why the record contains not a shred of evidence as to the applicable standard of legal care in a situation such as this one. Apparently the Petitioners expect this court to rule as a matter of law that the Kargianis firm reasonably should have suspected and therefore inquired about medical malpractice, simply because they are "sophisticated" lawyers, and without the necessity of any evidence of the applicable standard of legal care.

---

[11] RCW 4.16.350 provides that an action must be commenced within 3 years of the act or omission or alternatively within 1 year of the time that the claimant *or the claimant's representative* discovered or reasonably should have discovered that the injury was caused by a medical act or omission. Thus, Petitioners' argument that any lack of due diligence by Lo's attorneys must be imputed to Lo is sound.

Yet, it is clear from the medical affidavits contained in the record that prematurely born infants, who not uncommonly present in the footling breach position, are at greater risk of birth asphyxia than full-term babies, who normally present head first. In the absence of any evidence one way or the other on the issue of the applicable standard of legal care, it does not appear unreasonable to us for Lo's attorneys to have focused initially, and for many months exclusively, on the traumatic event which the client believed to have triggered the premature birth, particularly when that event was followed so closely by vaginal bleeding and premature contractions, and, 1 month later, by premature delivery. By the time the Kargianis firm learned that none of Brian's treating physicians believed that the incident with the Honda automobile triggered the premature birth, the expiration of the statute of limitations against Honda was imminent. Lo filed that lawsuit in spite of the discouraging medical opinions, and after surviving Honda's motion for summary judgment as to liability, was able to reach a settlement with Honda. This outcome lends some degree of credence to the reasonableness of the attorneys' initial focus in investigating causation.

The inquiries Lo's attorneys sent to Brian's treating physicians asked each of them to express an opinion about the causation both of Brian's prematurity and his cerebral palsy. Each of these doctors answered the inquiry in medical terms, relating the cerebral palsy to birth asphyxia due to the prematurity and the prolapsed cord. Thus, they stated only the immediate medical cause of the injury. All of these physicians negated Lo's theory with respect to the Honda vehicle. None of them causally connected the birth asphyxia with any medical act or omission during the process of the premature labor and birth. One inference which can be drawn from this is that insofar as causation was concerned, the prevailing medical explanation seemed to continue to be that sometimes these things just happen, just as Lo had been told from the start.

■ Because this is a review of a summary judgment proceeding, all the evidence and every reasonable inference therefrom must be viewed in the light most favorable to Lo. *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 518, 826 P.2d 664 (1992). We cannot say as a matter of law on the basis of the present record or even in general terms that an attorney who asks several physicians the same question ("What caused Brian's cerebral palsy?") and who is never told by any of those doctors that the condition could have been caused at least in part by medical error or omission, has failed to exercise that degree of due diligence required of a legal representative of a claimant under RCW 4.16.350, simply for failure to ask specifically about medical malpractice, particularly when the client has been told that sometimes these things just happen, and particularly when there reasonably appears to be a causal connection between the premature birth and the vehicle accident. We believe that the day has not yet come when attorneys must *automatically* suspect medical malpractice to be a proximate cause of every adverse medical outcome.[12] We also believe that a rational trier of fact could determine that the first notice the law firm had that the focus of its causation inquiry should be expanded to include the care Lo and Brian received during labor and delivery came in April 1991 (when Dr. Brown expressed reluctance to comment on care given by Puget Sound area physicians). This lawsuit was filed within 1 year of that date.

This would, of course, be an easier case, and in fact it is unlikely that there would be a limitations issue, if any of the physicians who were contacted in 1990 had been asked, "Could Brian's cerebral palsy be the result of a medical error or omission?" Still, there is nothing in the record to indicate that if that specific question had been asked of Dr. Nora Davis or any of the other doctors who were contacted

---

[12]Such a ruling would have grave implications for every attorney who undertakes to represent victims of automobile accidents, industrial injuries and virtually every other type of injury requiring medical treatment. If the patient does not enjoy a full recovery, must medical malpractice *automatically* be suspected as an intervening cause of the adverse outcome? We think not.

by the law firm, the answer would have been "yes". These same physicians told Lo on numerous occasions that sometimes these things just happen, implying that the condition could not have been prevented. Even now, all of the medical experts presented by the defense are answering the specific question that Lo's attorneys failed to ask in 1990 with a resounding "no".

Just as it appears that reasonable minds can differ on the question of whether Brian's condition was preventable under the applicable standard of medical care, so also do we believe that reasonable minds could differ on the question of whether the Kargianis firm exercised due diligence on Lo's behalf under RCW 4.16.350 and the applicable standard of legal care, whatever that standard may ultimately prove to be. This being so, the question of the Kargianis firm's due diligence on Lo's behalf is one for the trier of fact. None of the cases presented by the Petitioners dictates a different result. In fact, none of those cases deals with due diligence of an attorney-representative of a claimant. "[W]hen a patient or representative reasonably should have discovered the injury was caused by medical negligence is normally an issue of fact." *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 34-35, 864 P.2d 921 (1993) (citing *Honcoop v. State*, 111 Wn.2d 182, 194, 759 P.2d 1188 (1988); *Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 510, 598 P.2d 1358 (1979)). Having determined that due diligence both of Lo and her attorneys is a question of fact in this case, we affirm the trial court and remand for trial.

WEBSTER, C.J., and PEKELIS, J., concur.