[No. 42992-2-I.    Division One.    August 30, 1999.]

GAIL WINBUN, ET AL., *Respondents*, v. JANE A. MOORE, M.D., ET AL., *Defendants*, H. STEPHEN EPSTEIN, ET AL., *Appellants*.

*Thomas V. Harris* of *Merrick, Hofstedt & Lindsey, P.S.*, for appellants.

*Robert B. Gould* of *Law Offices of Robert B. Gould*, for respondents.

KENNEDY, C.J. — Under RCW 4.16.350(3), a professional negligence claim against a health care provider—absent "proof of fraud, intentional concealment, or a foreign body not intended to have a therapeutic or diagnostic purpose or effect"—must be brought (1) within three years of the alleged injury-causing act or omission, or (2) within one year from the time the plaintiff discovers or with due diligence reasonably should have discovered that the injury was caused by the act or omission, whichever is later. In this case, it is undisputed that Gail Winbun and her husband did not file their cause of action against Dr. H. Stephen Epstein and his wife within three years of when Dr. Epstein last treated Winbun, and that Winbun first suspected that her injuries were caused by medical malpractice more than one year before she filed her cause of action against Dr. Epstein and his wife. In addition, based on her own experts' testimonies, Winbun cannot seriously dispute that she easily could have discovered Dr. Epstein's negligence by having an expert review a complete set of her hospital records. Therefore, there is no substantial evidence or reasonable inferences therefrom to sustain the jury's special verdict

that Winbun neither discovered nor with due diligence reasonably should have discovered the factual basis of her cause of action against Dr. Epstein and his wife more than one year before she filed her cause of action against them. Accordingly, we hold that her cause of action against Dr. Epstein and his wife was barred by the statute of limitations as a matter of law, and reverse the judgment against Dr. Epstein and his wife with prejudice.

## STATEMENT OF FACTS

In February 1993, Gail Winbun began to suffer severe stomach and chest pains, headaches, and high blood pressure—all of which she attributed to stress over her family's troubled financial situation. On March 24, 1993, Winbun went to see her family practitioner and former co-worker, Dr. Jane Moore. Dr. Moore told Winbun to reduce her smoking and caffeine consumption, and recommended some over-the-counter medications. On March 30, 1993, Dr. Moore diagnosed Winbun with dyspepsia and high blood pressure, and prescribed some medication for her. Winbun's symptoms persisted. On April 8, 1993, Dr. Moore's physician's assistant examined Winbun and admonished Winbun to take the medication as directed by Dr. Moore. On April 13, 1993, Dr. Moore prescribed blood pressure medication for Winbun.

At approximately 12:30 P.M. on April 19, 1993, Winbun returned to the emergency room at Highline Community Hospital. Because Dr. Hill had diagnosed Winbun with PID, he called Dr. H. Stephen Epstein, the attending obstetrician/gynecologist on-call, to admit Winbun and treat her PID,

thereby transferring Winbun from Dr. Hill's care to Dr. Epstein's care. Dr. Epstein ordered various treatments for Winbun, but did not come to the hospital to see her.

Throughout the evening and night, nurses made numerous calls to Dr. Epstein regarding Winbun's condition and treatment. At 10:30 P.M., Dr. Epstein learned that Winbun's kidneys were "shutting down" and ordered the insertion of a Foley catheter to monitor urine output. Dr. Epstein did not come to the hospital to see Winbun, but requested that Dr. Dennis Hansen, the cardiologist on-call, examine Winbun's rapid heartbeat.

Dr. Hansen examined Winbun and consulted Dr. Marcia Gonzales, the surgeon on-call. Dr. Gonzales arrived at the hospital at approximately 3 A.M. and examined Winbun. Dr. Gonzales determined that Winbun needed immediate surgery and called Dr. Epstein. Approximately 30 minutes later, Dr. Epstein arrived at the hospital and commenced surgery, with Dr. Gonzales assisting. When it was determined that Winbun's problem was not gynecological, Dr. Gonzalez took over. The postoperative diagnosis was a perforated ulcer. Following her surgery, Winbun developed a severe esophageal stricture and Adult Respiratory Distress Syndrome (ARDS).

Winbun subsequently testified that, from the very beginning she felt that something had been done wrong, that is, that one of her doctors may have made a mistake. But she was reluctant to pursue the matter because she knew, liked, and respected Dr. Moore. In early 1994, Winbun obtained some of her medical records from Highline Community Hospital, including records for April 17, 19, and 20, 1993. Winbun did not obtain all of the records because she and her husband had filed for Chapter 13 bankruptcy protection and could not afford them. In the records she did obtain, Dr. Epstein's name appears as both the "admit physician" and "surgeon assistant." Ex. 20. These records also indicate that Dr. Epstein was involved in Winbun's preoperative care.

In May 1995, Winbun contacted attorney Robert Gould,

and on June 12, 1995, she met with Gould to discuss the medical treatment she received. Winbun gave Gould the medical records she had obtained, but asked him to hold off on investigating her claim, because she was not sure if she wanted to sue her family practitioner and former co-worker, Dr. Moore.

In January 1996, attorney Gould asked Dr. Robert Nielsen for his opinion regarding Winbun's medical care. Based on his review of the incomplete records that Winbun had obtained from the hospital, Dr. Neilsen opined "that Dr. Jane Moore and Dr. Carter Hill deviated from the minimum standard of care of reasonable physicians in the same or similar circumstances in their failure to correctly diagnose and treat their mutual patient, the Plaintiff Gail Sandra Winbun." Clerk's Papers at 57. On February 26, 1996, Winbun formally retained Mr. Gould, and on April 12, 1996, Winbun filed suit against Dr. Moore, Dr. Hill, and Highline Community Hospital.

On April 20, 1996, the three-year statute of limitations expired. On October 14, 1996, a hospital attorney asked Mr. Gould why Dr. Epstein was not named as a defendant. Winbun promptly instructed Dr. Nielsen to review all of her medical records to determine whether Dr. Epstein had acted negligently. From his review of the records, Dr. Nielsen opined that Dr. Epstein's conduct was a marked departure from the standard of care, was negligent, and had led to increased difficulties for Winbun. On November 6, 1996, Winbun amended her complaint to add Dr. Epstein and his wife as defendants.

Before trial, Dr. Epstein moved for summary judgment of dismissal from Winbun's complaint, contending that she did not timely file her cause of action against him as matter of law. In opposition to Dr. Epstein's motion for summary judgment, Winbun presented an affidavit from Dr. Gary B. Harris. In his affidavit, Dr. Harris stated that although Dr. Epstein's negligence would not be evident to a lay person reviewing Winbun's hospital records, Dr. Epstein's negligence would be "obvious" to a physician

experienced in both the drafting and reading of hospital records. Clerk's Papers at 743. The court denied Dr. Epstein's motion for summary judgment.

Before trial, one of Winbun's experts, Dr. Mize Connor, stated that it was "inconceivable" to him how anyone could review Winbun's hospital records and not conclude that Dr. Epstein had breached the standard of care. Clerk's Papers at 455. At trial, Dr. Connor opined that "the level of negligen[ce] that Dr. Epstein exhibited here and his blatant, non-recognition for inquiry into the severity of Mrs. Winbun's illness makes this, I think, without question, a grossest case of failure to meet the standard of care that I have run across." Report of Proceedings at 118-19. Dr. Connor further opined that "[a] second year medical student would have been sent back to college had he written orders like this for a patient in Mrs. Winbun's condition." *Id.* at 89.

Winbun, who was heavily sedated when she was in the hospital, testified that she remembered few details from April 19 and 20, 1993. She also testified that she thought Dr. Gonzalez was a "saint in my life" and that "Dr. Epstein was right underneath because he helped save me that day at surgery." *Id.* at 1157.

At the close of Winbun's case and again at the close of trial, Dr. Epstein moved for a directed verdict on the statute of limitations issue. The trial court denied both motions.

Sometime before the case was submitted to the jury, Winbun settled with Dr. Hill and Highline Community Hospital.

In a special verdict, the jury found that Winbun and her husband suffered $1,346,049.89 in total damages and that Dr. Epstein's negligence proximately caused 60% of those damages.[1] The jury also found that Winbun neither discovered nor with due diligence reasonably should have

---

[1]The jury was instructed that Dr. Hill was negligent as a matter of law, and found that he was responsible for 40% of Winbun's damages. The jury found that Dr. Moore was negligent but that her negligence was not a proximate cause of Winbun's damages. The jury also found contributory fault on the part of Winbun but that this was not a proximate cause of her damages.

discovered the factual basis of her cause of action against Dr. Epstein more than one year before she filed suit against Dr. Epstein. Clerk's Papers at 345. The trial court then entered judgment for Winbun and her husband in the amount of $807,629.93, plus statutory attorney fees and costs. Dr. Epstein appeals, contending, inter alia, that the trial court erred in denying his motions for directed verdict based on the expiration of the statute of limitations.[2]

## DISCUSSION

Under RCW 4.16.350(3), a professional negligence claim against a health care provider—absent "proof of fraud, intentional concealment, or the presence of a foreign body not intended to have a therapeutic or diagnostic purpose or effect"—must be brought (1) within three years of the alleged injury-causing act or omission, or (2) within one year from the time the plaintiff discovers or with due diligence reasonably should have discovered that the injury was caused by the act or omission, whichever is later. *Gunnier v. Yakima Heart Ctr., Inc.*, 134 Wn.2d 854, 861-64, 953 P.2d 1162 (1998).[3] "One who has notice of facts sufficient to prompt a person of average prudence to inquire is deemed to have notice of all facts which reasonable inquiry would disclose." *Enterprise Timber, Inc. v. Washington Title Ins. Co.*, 76 Wn.2d 479, 483, 457 P.2d 600 (1969); *accord Green v. A.P.C.*, 136 Wn.2d 87, 96, 960 P.2d 912 (1998). The purpose of the two alternative limitations periods is to encourage the prompt filing of claims—which, in turn, increases the likelihood of accurate determinations and removes the burdens of threatened litigation—without precluding meritorious claims based on facts that an injured party could not have reasonably discovered before

---

[2]Our disposition of the statute of limitations issue makes it unnecessary to discuss Dr. Epstein's remaining contentions on appeal.

[3]In *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 150, 960 P.2d 919 (1998), the Supreme Court held RCW 4.16.350(3)'s eight-year statute of repose invalid because it violates the Privileges and Immunities Clause of the Washington Constitution.

the standard statutory limitations period expired. *See Ruth v. Dight*, 75 Wn.2d 660, 665, 453 P.2d 631 (1969), *abrogated by* RCW 4.16.350(3); *Beard v. King County*, 76 Wn. App. 863, 867-68, 889 P.2d 501 (1995).

In this case, it is undisputed that Winbun filed her cause of action against Dr. Epstein on November 6, 1996, more than three years after Dr. Epstein last treated her on April 20, 1993. Therefore, if she timely filed her cause of action against Dr. Epstein, she must have done so under RCW 4.16.350's one-year delayed discovery rule.

■ "The question of when a patient or representative reasonably should have discovered the injury was caused by medical negligence is normally an issue of fact." *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 34-35, 864 P.2d 921 (1993). If, however, reasonable jurors could reach but one conclusion, the trial court may decide the issue as a matter of law. *Allen v. State*, 118 Wn.2d 753, 760, 826 P.2d 200 (1992). "When a trial court denies summary judgment due to factual disputes, as here, and a trial is subsequently held on the issue, the losing party must appeal from the sufficiency of the evidence presented at trial, not from the denial of summary judgment." *Adcox*, 123 Wn.2d at 35 n.9; *accord Moore v. Wayman*, 85 Wn. App. 710, 718-19, 934 P.2d 707, *review denied*, 133 Wn.2d 1019 (1997); *Bratton v. Calkins*, 73 Wn. App. 492, 496, 870 P.2d 981 (1994). Therefore, this court reviews the trial court's denial of Dr. Epstein's motion for a directed verdict on the statute of limitations issue under the sufficiency of the evidence standard:

> In reviewing a trial court's decision to deny a motion for directed verdict or judgment n.o.v., we apply the same standard as the trial court. A directed verdict or judgment n.o.v. is appropriate if, when viewing the material evidence most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party. The requirement of substantial evidence necessitates that the evidence be such that it would convince "an unprejudiced, thinking mind."

*Industrial Indem. Co. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520, 7 A.L.R.5TH 1014 (1990) (citations omitted) (footnote omitted), *cited in Adcox*, 123 Wn.2d at 35.

Dr. Epstein contends that due diligence required Winbun, as a matter of law, to review all of her hospital records and identify all possible defendants in 1993, when she first suspected that medical malpractice caused her injuries. Winbun maintains that she reasonably thought that Drs. Moore and Hill negligently caused her injuries and had no reason to suspect that Dr. Epstein was also negligent until a hospital attorney asked about Dr. Epstein in October 1996. She contends, therefore, that the record supports the jury's special verdict finding that she neither discovered nor with due diligence reasonably should have discovered the factual basis of her cause of action against Dr. Epstein more than one year before she filed her cause of action against him.

█ RCW 4.16.350(3) provides a statute of limitations with alternate periods in which to file the action, the expiration of three years from the time of the alleged act or omission causing the injury or one year from the time the plaintiff discovers or reasonably should have discovered that his or her injury was caused by medical malpractice, whichever is later. Notably, the statute does not reference the point in time that the plaintiff discovers or reasonably should have discovered the alleged tortfeasor's identity. Instead, it references the point in time that the plaintiff discovers or reasonably should have discovered that his or her injury was caused by medical malpractice. We conclude that RCW 4.16.350(3) does not toll the statute of limitations until one year after the plaintiff discovers or reasonably should have discovered the alleged tortfeasor's identity.[4] *See McDougal v. Weed*, 945 P.2d 175, 177 (Utah Ct. App. 1997) (construing a statute that is identical in all

---

[4]In *Orear v. International Paint Co.*, 59 Wn. App. 249, 796 P.2d 759 (1990), this court stated: "Although no Washington court has explicitly decided whether knowledge or imputed knowledge of a particular defendant's identity is necessary for the plaintiff's cause of action against that defendant to *accrue*, we hold that such knowledge is necessary, *absent countervailing statutory language." Id.* at

respects here material to RCW 4.16.350(3)). Instead, when relying on RCW 4.16.350(3)'s delayed discovery rule, a plaintiff must investigate and identify all possible defendants within one year of when the plaintiff first suspects that his or her injuries were caused by medical malpractice: "The identity of the practitioner who committed the alleged malpractice is one of the facts that the plaintiff must investigate, and discover, once she has reason to believe that she is the victim of medical malpractice." *Flowers v. Walker*, 63 Ohio St. 3d 546, 589 N.E.2d 1284, 1288 (1992).

This rule is neither unreasonable nor overly harsh. In most cases not involving fraud, intentional concealment, or a foreign body not intended to have a therapeutic or diagnostic purpose or effect, the plaintiff will quickly suspect that his or her injuries were caused by medical malpractice and have three years to investigate and identify all possible defendants. Indeed, here, Winbun did quickly suspect that her injuries were caused by medical malpractice and had three years to investigate and identify all possible defendants. But even where this is not the case, one year from the date that the plaintiff discovers or with due diligence reasonably should have discovered that his or her injury was caused by medical malpractice is not an unreasonably short period of time to investigate whether the plaintiff has a claim and discover all possible defendants. *Gunnier*, 134 Wn.2d at 863. Moreover, this rule encourages the prompt filing of accurate claims without undercutting the underlying purpose of the discovery rule:

The hardship imposed upon a party who is unaware he has an

255 (emphasis added). Therefore, applying the common law discovery rule, the court held that the statute of limitations does not commence in products liability cases until the plaintiff discovers or reasonably should have discovered the responsible parties' identities. *Id.* at 257.

In medical malpractice cases, however, RCW 4.16.350(3) replaced the former concept of accrual that the courts use when applying the common law discovery rule. *Gunnier v. Yakima Heart Ctr.*, 134 Wn.2d 854, 863, 953 P.2d 1162 (1998). Therefore, notwithstanding the common law discovery rule, RCW 4.16.350(3) does not toll the statute of limitations until one year after the plaintiff discovers or reasonably should have discovered the alleged tortfeasor's identity.

actionable injury until after the limitations period has run is much more severe than that imposed upon a party who knows, or reasonably should know, he has suffered an actionable injury but does not learn the identity of the person who injured him until after the limitations period has passed. The former is in no position to take advantage of the limitations period in which to determine the identity of the party injuring him. The latter, however, knows he has a cause of action, has the time given by the limitations period to attempt to learn the identity of the person who injured him and is not in the position of being barred before ever knowing of his right to sue.

*Guebard v. Jabaay,* 65 Ill. App. 3d 255, 381 N.E.2d 1164, 1167, 21 Ill. Dec. 620, 623 (1978); *see also Beard,* 76 Wn. App. at 867-68 (discovery rule balances injured claimant's right to legal remedies against threat of having statute of limitations expire before he knows he has been injured). Therefore, we hold that under RCW 4.16.350(3)'s discovery rule, the one-year statute of limitations commences when the plaintiff knows or reasonably should know that his or her injuries were caused by medical malpractice, regardless of whether the plaintiff knows or reasonably should know the alleged tortfeasor's identity.

In this case, Winbun testified that she suspected that her injuries were caused by medical malpractice sometime in 1993. Although Winbun claims that she had no reason to suspect that Dr. Epstein's negligence caused her injuries until a hospital attorney asked about Dr. Epstein in October 1996, based on her own experts' testimony, Winbun cannot seriously dispute that she could have easily discovered Dr. Epstein's negligence by having an expert review a complete set of her hospital records. It is of absolutely no consequence that she directed her attorney not to investigate her claims immediately because she was struggling with her personal decision to sue, *Allen,* 118 Wn.2d at 759, or that she reasonably thought that only Drs. Moore and Hill caused her injuries, or that the cost of obtaining her complete medical records was beyond her financial means. Therefore, there is no substantial evidence or reasonable inferences to sustain the jury's special verdict that Winbun

neither discovered nor with due diligence reasonably should have discovered the factual basis of her cause of action against Dr. Epstein more than one year before she filed her cause of action against him. Thus, the trial court should have granted Dr. Epstein's motions for directed verdict based on the expiration of the statute of limitations.[5]

Accordingly, we reverse and remand with instructions to vacate the judgment against Dr. Epstein and his wife, and dismiss them as defendants with prejudice.

AGID and COX, JJ., concur.

After modification, further reconsideration denied November 4, 1999.

Review granted at 140 Wn.2d 1012 (2000).

---

[5]Winbun also points to testimony that she could not file her cause of action against Dr. Epstein before November 1995 without running afoul of CR 11. Winbun's contention, however, fails to appreciate that the discovery rule only tolls the statute of limitations for one year from the time the plaintiff discovers or reasonably should have discovered sufficient facts to put her on notice that she may have a claim, not until she has sufficient facts to file a claim. Therefore, "Rule 11 has absolutely nothing to do with the discovery rule." *Kansa Reinsurance Co. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1370 (5th Cir. 1994). Indeed, if Winbun's contention were correct, plaintiffs could sit on their claims indefinitely so long as they avoid discovering sufficient facts to file suit without violating CR 11.