18 P.3d 576 (2001)
143 Wash.2d 206
Gail WINBUN and Lee Winbun, wife and husband, and the marital community composed thereof, Petitioners,
v.
Jane A. MOORE, M.D. and John Doe Moore, wife and husband, and the marital community composed thereof; Carter Hill, M.D. and Jane Doe Hill, husband and wife, and the marital community composed thereof; and Highline Community Hospital, a Washington non-profit corporation, Defendants,
H. Stephen Epstein and Jane Doe Epstein, husband and wife, and the marital community composed thereof, Respondents.
No. 68967-9.
Supreme Court of Washington, En Banc.
Argued October 24, 2000.
Decided March 8, 2001.
*577 Wiggins Law Office, Charles Kenneth Wiggins, Kenneth Wendell Masters, Bainbridge Island, Robert B. Gould, Seattle, for petitioners.
Harbaugh & Bloom, Gary Neil Bloom, Spokane, Longfelder, Tinker & Kidman, Gregg L. Tinker, Seattle, Bryan Patrick Harnetiaux, Spokane, amicus curiae on behalf of Washington State Trial Lawyers Ass'n.
Merrick, Hofstedt & Lindsey, Thomas V. Harris, Seattle, for respondents.
IRELAND, J.
Petitioner Gail Winbun sought review of a Court of Appeals' decision reversing a jury verdict which awarded her damages for negligent medical care provided by Dr. Stephen Epstein. Finding that there is substantial evidence to sustain the jury's verdict that the cause of action was timely filed, we reverse the Court of Appeals and reinstate the trial court's judgment against Epstein.

ISSUES
This case presents the following issues:
(1) Whether there is substantial evidence that the plaintiff commenced her professional negligence action against Epstein within one year of the date that she discovered or with due diligence should have discovered the factual basis of her claim; and
(2) Whether knowledge of suspected professional negligence as to one health care provider necessarily triggers the medical malpractice discovery rule of RCW 4.16.350 as to all other health care providers who treated the plaintiff.

FACTS
Gail Winbun (Winbun) initially filed a medical malpractice action against her family physician, emergency room physician, and the hospital where she was treated. The action was commenced within the three-year limitation period set by statute. Subsequently, Winbun's attending physician, Dr. Stephen Epstein (Epstein), was joined as a codefendant. Epstein asserts that Winbun's claim against him was untimely.
In March of 1993, Winbun consulted her family physician, Dr. Jane Moore (Moore), about complaints of chest and abdominal pain, nausea, back pain, and vomiting. During March and April, she saw Moore several times, complaining of continued burning in her stomach. Moore noted Winbun's symptoms of dyspepsia (indigestion) and elevated blood pressure. She advised Winbun to decrease stress, smoking, and caffeine, and she recommended over-the-counter antacids. When Winbun's symptoms persisted, Moore prescribed medication.
On April 17, 1993, Winbun, complaining of severe abdominal pain, nausea, and difficulty breathing, was transported by ambulance to Highline Community Hospital (Highline). She was diagnosed by Highline emergency room physician, Dr. Carter Hill (Hill), with pelvic inflammatory disease (PID). Hill prescribed antibiotics and pain medication, and Winbun was discharged.
Winbun's condition worsened, and around noon on April 19, 1993, Winbun's husband *578 took her back to the emergency room at Highline. Because of his previous diagnosis of PID, Hill telephoned Highline's on-call obstetrician/gynecologist, Dr. Epstein, to admit and treat Winbun. Epstein testified that Hill did not provide Winbun's signs and symptoms, and Epstein did not come to the hospital to examine Winbun.
Epstein received several calls from the nursing staff regarding Winbun's condition during the evening. At 9:30 p.m., Winbun was transferred to the telemetry unit. At 10:30 p.m., Epstein was advised that Winbun's kidneys were failing. He did not come to the hospital, but ordered treatment and requested an examination by the on-call cardiologist because of Winbun's rapid heartbeat.
The cardiologist consulted with Dr. Marcia Gonzalez (Gonzalez), the on-call surgeon. Gonzalez examined Winbun at about 3 a.m., determined that immediate surgery was needed, and called Epstein. Epstein arrived at the hospital about 30 minutes later and began surgery, with Gonzalez assisting. The initial exploratory laparotomy revealed that Winbun's medical problems were not gynecological. Thereafter, Gonzalez took over and discovered a perforated gastric ulcer with more than two liters of brownish pus in Winbun's abdominal cavity.
Following the surgery, Winbun remained in the hospital for two months. She required additional surgery due to continued infection. A feeding tube was inserted into her small intestine, a breathing tube was placed in her throat, and a nasal-gastric tube was inserted into her stomach. She suffered kidney failure and developed adult respiratory distress syndrome (a pulmonary condition) and a stricture (narrowing) of her esophagus.
Winbun testified that, from the beginning, she felt that one of her doctors may have made a mistake. She suspected Moore had misdiagnosed her condition. However, she was reluctant to pursue the matter because she liked and respected Moore.
In early 1994, Winbun obtained some of her medical records from Highline, including records for April 17 and partial records for April 19 and 20, 1993. Winbun did not request records for her subsequent hospitalization.
Two years after her hospitalization, on June 12, 1995, Winbun met with Attorney Robert Gould (Gould) to discuss the possibility of bringing a medical negligence suit. Winbun gave Gould the medical records she had obtained, but she asked him not to investigate the claim at that time because she was not certain that she wanted to sue Moore.
In January of 1996, Winbun authorized Gould to seek the opinion of Dr. Robert Nielsen (Nielsen) regarding Winbun's medical care. Winbun testified that she discussed only the potential liability of Moore with Gould; she had no reason to believe that Epstein might have been negligent. Based on his review of the records that Winbun had obtained from the hospital, Nielsen opined "that Dr. Jane Moore and Dr. Carter Hill deviated from the minimum standard of care of reasonable physicians in the same or similar circumstances in their failure to correctly diagnose and treat their mutual patient, the Plaintiff, Gail Sandra Winbun." Clerk's Papers at 57.

PROCEDURAL HISTORY
Winbun formally retained Gould on February 26, 1996, and her action against Moore, Hill, and Highline was commenced on April 12, 1996. The three-year statute of limitations expired on April 20, 1996.
On October 14, 1996, counsel for Highline asked Gould why Epstein had not been named as a defendant in the action. After the question was raised, Winbun instructed Nielsen to review all of her medical records to determine whether Epstein had acted negligently in her treatment. Nielsen opined that Epstein's conduct constituted a marked departure from the standard of care, was negligent, and had led to increased difficulties for Winbun. On November 6, 1996, Winbun amended the complaint to join Epstein as a codefendant.
Before trial, Epstein sought dismissal of the action, contending that Winbun did not timely file her cause of action against him as a matter of law. In opposition to Epstein's motion for summary judgment, the *579 affidavit of Dr. Gary B. Harris (Harris) was presented. In his affidavit, Harris stated that although Epstein's negligence would be clear to a physician experienced in drafting and reading hospital records, it would not be apparent to a lay person. The court denied Epstein's motion. At the close of Winbun's case and at the close of trial, Epstein moved for a directed verdict on the statute of limitations issue. The trial court denied both motions.
Winbun, who was heavily sedated in the hospital, testified that she remembered few details from April 19 and 20, 1993. She also testified that she thought Dr. Gonzalez was "a saint in my life" and that "Dr. Epstein was right underneath because he helped save me that day at surgery." Verbatim Report of Proceedings at 1157.
Before the case was submitted to the jury, Winbun settled with Hill and Highline. In the special verdict following a two-week trial, the jury awarded damages to Winbun, finding that Epstein's negligence proximately caused 60 percent of those damages.[1] The trial court entered judgment for Winbun against Epstein in the amount of $807,629.93 plus costs. Epstein appealed, contending that the trial court erred in denying his motions for directed verdict based on the expiration of the statute of limitations.
The Court of Appeals reversed and remanded with instructions to vacate the judgment against Epstein and dismissed him as a codefendant with prejudice. This court granted Winbun's petition for review of the Court of Appeals' decision.

ANALYSIS
Standard of Review
The determination of when a plaintiff discovered or through the exercise of due diligence should have discovered the basis for a cause of action is a factual question for the jury. Crisman v. Crisman, 85 Wash.App. 15, 23, 931 P.2d 163 (1997). "When a trial court denies summary judgment due to factual disputes, ... and a trial is subsequently held on the issue, the losing party must appeal from the sufficiency of the evidence presented at trial...." Adcox v. Children's Orthopedic Hosp. & Med. Ctr., 123 Wash.2d 15, 35 n. 9, 864 P.2d 921 (1993).
In the present case, a factual dispute was presented to the jury: At what point did Winbun discover or should she have discovered the elements of her medical malpractice claim against Epstein? The jury specifically found that Winbun and her attorney neither discovered nor with due diligence should have discovered the factual basis of Winburn's claim more than one year before she filed the action against Epstein.[2]
"In reviewing this finding, as with any other jury verdict, we must determine whether it is supported by sufficient evidence." Adcox, 123 Wash.2d at 35, 864 P.2d 921 (footnote omitted). Therefore, this court reviews the jury's verdict on the statute of limitations issue under the sufficiency of the evidence standard: "The record must contain a sufficient quantity of evidence to persuade a rational, fair-minded person of the truth of the premise in question." Canron v. Fed. Ins. Co., 82 Wash.App. 480, 486, 918 P.2d 937 (1996).
The Statute of Limitations
RCW 4.16.350, the statute of limitations governing professional negligence claims against health care providers, states, in pertinent part, as follows:

*580 Any civil action for damages for injury occurring as a result of health care ... based upon alleged professional negligence [absent proof of fraud, intentional concealment, or the presence of a foreign body not intended to have a therapeutic or diagnostic purpose or effect] shall be commenced within three years of the act or omission alleged to have caused the injury or condition, or one year of the time the patient or his representative discovered or reasonably should have discovered that the injury or condition was caused by said act or omission, whichever period expires later....
RCW 4.16.350.
The statute provides two alternative limitations periods. Actions must either be commenced within three years of the alleged injury-causing act or omission, or within one year from the time the plaintiff discovers or reasonably should have discovered that the injury was caused by the act or omission (the discovery rule), whichever is later.[3]
Since it is undisputed that Winbun filed her cause of action against Epstein more than three years after Epstein last treated her, the issue before us is whether Winbun satisfied the requirements of the discovery rule provided by RCW 4.16.350. In this case, the statutory discovery rule must be analyzed and applied where a plaintiff was treated by multiple health care providers.
Substantial Evidence
The trial court found genuine issues of material fact regarding application of the discovery rule to the claim against Epstein and submitted the issue to the jury. The jury specifically found that Winbun and her attorney neither discovered, nor with due diligence reasonably should have discovered, the factual basis of her claim against Epstein more than one year before the action was commenced against him. Therefore, Winbun had commenced her action within one year of her discovery that her injuries may have resulted from Epstein's wrongful conduct, and her claim was not barred by the statute of limitations.
The Court of Appeals ruled that the one-year discovery period commences when the patient knows or reasonably should know that her injuries were caused by medical malpractice, regardless of whether the patient knows or reasonably should know the alleged tortfeasor's identity. Thus, Winbun's claim against Epstein is barred as a matter of law. The Court of Appeals held as follows:
[W]hen relying on RCW 4.16.350(3)'s delayed discovery rule, a plaintiff must investigate and identify all possible defendants within one year of when the plaintiff first suspects that his or her injuries were caused by medical malpractice: "The identity of the practitioner who committed the alleged malpractice is one of the facts that the plaintiff must investigate, and discover, once she has reason to believe that she is the victim of medical malpractice."
Winbun v. Moore, 97 Wash.App. 602, 611, 982 P.2d 1196 (1999) (quoting Flowers v. Walker, 63 Ohio St.3d 546, 589 N.E.2d 1284, 1288 (1992)).
The Court of Appeals reasoned that because Winbun testified that she suspected her injuries were caused by medical malpractice early on, and because Dr. Epstein's negligence could have been easily discovered by an expert reviewing a complete set of Winbun's medical records, her failure to include Epstein in her malpractice suit against the other health care providers until after the statute of limitations had run barred her claim as a matter of law. The appellate court stated that "[i]t is of absolutely no consequence ... that she reasonably thought that only Drs. Moore and Hill caused her injuries." Winbun, 97 Wash.App. at 612, 982 P.2d 1196.
The appellate court concluded that there was no substantial evidence to sustain the jury's special verdict that Winbun did not discover, nor with due diligence reasonably should have discovered, the factual basis of *581 the essential elements of the potential cause of action against Dr. Epstein more than one year before she filed her claim. Id. at 603-04, 982 P.2d 1196. "Thus, the trial court should have granted Dr. Epstein's motions for directed verdict based on the expiration of the statute of limitations." Id. at 613, 982 P.2d 1196.
The parties dispute whether the medical records obtained by Winbun establish that she "discovered or reasonably should have discovered" that her injuries were caused by Epstein's negligent act or omission. Winbun testified that she could not determine from the limited records she received that Epstein had been negligent. Epstein asserts that the records obtained by Winbun fully detailed the medical care he provided.
Epstein's claim that the records obtained by Winbun are "the relevant, and only, records relating to the care which Dr. Epstein provided" is incorrect. Answer to Pet. for Review at 4. Winbun made a written request for copies of all medical records of her treatment at Highline for April 17, 19, and 20, 1993 (Authorization to Release Patient Medical Information). Winbun testified that Exhibits 20 and 21, which were admitted at trial, contained all of the records sent to her following the request. The records Winbun received did not include the following significant documents relating to Winbun's admission and care on April 19: ER Physician Report; Emergency Room Admission Note; Physician's Order Sheet; Nursing Assessment Narrative Addenda; and Daily Critical Care Nursing Progress Record. The omitted documents are significant to a determination of Epstein's negligence. They include the time Hill admitted Winbun to the medical floor and notified Epstein (when Winbun became Epstein's patient), Epstein's initial admission orders for Winbun's care (taken by Hill over the telephone from Epstein), the nurses' evening observations of Winbun's signs of shock and deteriorating condition, and the nurses' attempts to contact Epstein.
It is arguable that the missing documents obscured Winbun's ability to determine the nature and extent of Epstein's care. The record supports the premise that Winbun exercised reasonable diligence in requesting her treatment records. Reasonable minds could differ as to whether Winbun discovered or should have discovered the factual basis of the elements of her claim against Epstein more than one year before she filed the action against him. The Court of Appeals erred in taking this issue from the jury and in deciding as a matter of law that her cause of action was barred by the statute of limitations. Substantial evidence supports the jury's verdict.
Interpretation of the Statute of Limitations
The Court of Appeals interprets the statute of limitations to mean that the one-year discovery period begins to run when the plaintiff discovers or reasonably should have discovered that his or her injury was caused by the medical malpractice of any doctor. However, the language of the statute does not support this interpretation. Rather, the discovery rule is triggered by a plaintiff's discovery of "said act or omission" the act or omission that caused the injury. In the case of multiple health care providers and injuries, the plaintiff's knowledge of an act or omission by one health care provider that triggers the discovery rule does not necessarily trigger the rule as to all providers who treat the plaintiff.
The Court of Appeals states as follows:
Notably, the statute does not reference the point in time that the plaintiff discovers or reasonably should have discovered the alleged tortfeasor's identity. Instead, it references the point in time that the plaintiff discovers or reasonably should have discovered that his or her injury was caused by medical malpractice. We conclude that RCW 4.16.350(3) does not toll the statute of limitations until one year after the plaintiff discovers or reasonably should have discovered the alleged tortfeasor's identity.
Winbun, 97 Wash.App. at 610, 982 P.2d 1196. However, this analysis is misplaced. That Epstein was a health care provider who provided treatment at the time Winbun was injured was fully known at the filing of the initial complaint. There was no failure to identify. It was the lack of knowledge of any *582 act or omission by Epstein which caused the injury that resulted in Epstein not being named as an original defendant.
When Winbun requested her medical records for treatment she received on April 17, 19, and 20, had she been provided with all of the records, it might have been reasonable to take the case from the jury. However, Winbun was neither provided all the records of Epstein's treatment nor advised that other records for her treatment on April 19 existed. Under those circumstances, whether Winbun acted reasonably or should have discovered the negligence at an earlier time is a fact-specific inquiry properly reserved for the jury.
In addition, the Court of Appeals' decision in the case before us is difficult to reconcile with the same court's decision in Lo v. Honda Motor Co., 73 Wash.App. 448, 869 P.2d 1114 (1994). In that case, when the pregnant plaintiff, Elizabeth Lo (Lo), started the engine of her Honda car, the vehicle suddenly accelerated uncontrollably. Lo was unable to stop the vehicle with the brakes alone, so she thrust the gear-shift lever backward and forward in an effort to kill the engine. Before the engine died, she was thrashed about violently by the jerking of the vehicle. Soon after the incident, she experienced vaginal bleeding and premature contractions. One month later, she gave birth to her son prematurely. The child was diagnosed as a spastic quadriplegic with cerebral palsy.
Lo related her son's injuries to his premature birth which she believed was caused by the physical trauma she received in her car. Within three years of the car incident, Lo commenced a product liability lawsuit against Honda, alleging that her car was defective and caused the accident that led to her child's premature birth and cerebral palsy.
An expert physician later opined that medical negligence had caused or contributed to the child's condition. More than four year's after her son's birth, Lo amended the complaint against Honda to add the hospital and treating doctors as additional defendants.
In Lo, the plaintiff believed that the negligence of one entity, Honda Motor Company, caused the injury. The court declined to hold as a matter of law that her belief also commenced the discovery period as to the other potential defendants, the hospital and the doctors who delivered the child. Rather, the court stated that there may not be a duty as a matter of law to inquire specifically about the possibility of medical malpractice "where there is another facially logical explanation" for the injury. Lo, 73 Wash.App. at 456, 869 P.2d 1114.
The Lo court declined to apply the general rule it applied in the case now before us knowledge the plaintiff presumably would have discovered, if she had timely made the necessary inquiry, must be imputed to the plaintiff as a matter of law. Id. at 460, 869 P.2d 1114; Winbun, 97 Wash.App. at 608, 611, 982 P.2d 1196. Application of the general rule may be appropriate where injured plaintiffs do little to pursue their potential claims. See, e.g., Zaleck v. Everett Clinic, 60 Wash.App. 107, 114, 802 P.2d 826 (1991) (plaintiff who knew of his injury but failed to inquire of either a doctor or a lawyer was deemed to have failed to exercise due diligence); Reichelt v. Johns-Manville Corp., 107 Wash.2d 761, 768-73, 733 P.2d 530 (1987) (plaintiff who knew he had asbestosis and the cause of the disease failed to timely pursue claim); Gevaart v. Metco Constr., Inc., 111 Wash.2d 499, 760 P.2d 348 (1988) (plaintiff injured by improperly constructed step failed to timely pursue claim). However, that is not the situation in Lo or the instant case. In Lo, the court determined that the appropriate inquiries an injured plaintiff must make depend on the circumstances of the case due diligence was a question for the trier of fact. Lo, 73 Wash.App. at 464, 869 P.2d 1114.
Like Lo, Winbun was faced with a "facially logical explanation" for her injuries delay of appropriate treatment due to the initial misdiagnosis of her condition by her family physician and later misdiagnosis by the emergency room physician. While in the hospital, Winbun was heavily sedated and unaware of Epstein's full role in her care. She later understood that a team of surgeons had saved her life. Although Epstein's name appears in her hospital records, so do the names of several other hospital physicians who treated her. From the medical records *583 that Winbun received, it was not readily apparent that Epstein's conduct delayed appropriate treatment.
The instant case differs significantly from Lo. In that case, the multiple possible causes of harm were of different types defective product and malpractice. In this case, multiple causes of harm are of the same type malpractice, but by different doctors. Nevertheless, the rationale of Lo should also be applicable here. The reasonableness of Winbun's failure to inquire into Epstein's negligence, given the presence of another facially logical explanation for her injuries, is properly a question for the jury.
Public Policy Consideration
Finally, Amicus Curiae Washington State Trial Lawyers Association Foundation argues that the Court of Appeals' interpretation could lead to unjust results:
The reality is that evidence that other non-party health care providers doctors, nurses, laboratory and radiology professionals might have been negligent frequently does not surface until a case progresses through discovery, including the stage at which treating and forensic experts are deposed. This is true even when a plaintiff exercises utmost care to discover all negligent health care providers with due diligence and dispatch. Not infrequently, the particular acts or omissions of other, non-party health care providers fail to surface despite vigorous investigation and discovery.
Br. of Amicus at 15.
Amicus asserts that the wording of RCW 4.16.350 properly anticipates complex medical malpractice litigation that involves multiple health care providers in that the statute "dictates that a plaintiff have actual or constructive knowledge of the acts or omissions of a discrete health care provider before the discovery rule is triggered as to that particular provider." Id. at 15-16 (emphasis added). The Court of Appeals has imposed an all-encompassing duty to "investigate and identify all possible defendants within one year of when the plaintiff first suspects that his or her injuries were caused by medical malpractice." Winbun, 97 Wash.App. at 611, 982 P.2d 1196.
Contrary to the view of the Court of Appeals, amicus argues that failure to individualize the malpractice discovery rule can be unduly harsh where a plaintiff, despite due diligence, could not have discovered the acts or omissions of a particular health care provider within the one-year discovery period. This is especially serious in medical malpractice cases where there is a vast difference between what can be uncovered from "investigation" as opposed to "discovery." No health care provider is required to meet with plaintiff's counsel to explain his or her actions prior to a lawsuit. Only when a suit commences are witnesses subject to subpoena and examination under oath.
Amicus also recognizes that a particularized application of the malpractice discovery rule is consistent with the concept "that there may be more than one proximate cause of an injury." Br. of Amicus at 14. Thus, a separate discovery rule would properly "apply to the acts or omissions of each health care provider who is alleged to have been a proximate cause of a plaintiff's injury." Id.
Aside from the issues raised by amicus, we are concerned that application of the rule as propounded by the Court of Appeals could encourage a "guilt by association" approach to medical malpractice claims. The rule adopted by the appellate court could lead to suing any health care providers identified with the treatment which injured the plaintiff whether or not specific acts or omissions could be attributed to such providers at the time the suit was commenced. Because of the possibility that such acts or omissions might later be determined in discovery, the temptation would be to sue first and conduct discovery later. Such a practice would run counter to CR 11, which requires "that to the best of the party's or attorney's knowledge, information, and belief, formed after reasonable inquiry [every pleading, motion, and legal memorandum] is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." CR 11.
Under an individualized application of the discovery rule, those who provided health care where malpractice is alleged, but where *584 no acts or omissions have been identified as to their conduct during investigation, would be spared unnecessary involvement in the litigation.
Independent Basis for Reversal
Epstein asserts that in addition to the statute of limitations argument, there is another independent basis for reversal lack of evidence of proximate cause. Epstein states: "The trial court erred in allowing Mize Conner, M.D., the plaintiff's gynecologic expert, to testify on damage-causation issues involving pulmonary and gastroenterologic conditions." Answer at 19. He concludes that "the Court of Appeals would have dismissed this matter with prejudice on that ground alone." Id.
During trial, Winbun's counsel asked Conner to state his opinion of the damages caused by Epstein's acts and omissions. Epstein's counsel objected to the lack of foundation, and the court sustained the objection. After Winbun's counsel laid foundation, Epstein's counsel again objected, and the court overruled the objection.
Conner then testified about Winbun's postoperative condition. The trial court did not abuse its discretion in admitting the testimony of Conner under ER 702.
Epstein's counsel cross-examined Conner at some length about his causation testimony. Later, in his case in chief, Epstein called Dr. Kenneth P. Steinberg, who gave detailed contrary opinions concerning causation of adult respiratory distress syndrome. It was for the jury to weigh the experts' testimony.

CONCLUSION
"[W]hen a patient or representative reasonably should have discovered the injury was caused by medical negligence is normally an issue of fact." Adcox, 123 Wash.2d at 34-35, 864 P.2d 921. In the case before us, reasonable minds could have found that Winbun commenced her action within one year of when Winbun and Gould discovered or should have discovered the factual basis of the cause of action against Epstein. The Court of Appeals erred in taking this issue from the jury. Substantial evidence supports the jury's verdict.
The Court of Appeals' interpretation of RCW 4.16.350 is contrary to the language of the statute, and its holding in the case before us cannot be reconciled with its own decision in Lo v. Honda Motor Company. Both the statutory language and the prior case law support the holding that knowledge of suspected professional negligence as to one health care provider does not of necessity trigger the medical malpractice discovery rule of RCW 4.16.350 as to all other health care providers who also treated the plaintiff. In addition, the Court of Appeals' decision could lead to unjust results in medical malpractice litigation that involve multiple health care providers.
In summary, (1) substantial evidence supports the jury's verdict; (2) the appellate court's interpretation of RCW 4.16.350 is contrary to the language of the statute; (3) the holding cannot be reconciled with existing case law; and (4) the decision could lead to unjust results in medical malpractice litigation involving multiple health care providers. Therefore, the Court of Appeals is reversed, and the judgment on the jury verdict is reinstated.
ALEXANDER, C.J., SMITH, JOHNSON, SANDERS, and BRIDGE, JJ., concur.
TALMADGE, J.[*] (dissenting).
I dissent in this case because the majority lends further confusion to when a civil cause of action in Washington accrues for purposes of a discovery rule associated with a statute of limitations. Moreover, the majority gives short shrift to numerous Washington cases that have addressed and resolved the issue of when a person should have known of the existence of a cause of action. The discovery rule in RCW 4.16.350 is intended to strike a balance between the needs of patients to obtain legal relief for the later discovered consequences of medical malpractice *585 and the needs of doctors to extinguish stale claims after a reasonable limitation period has elapsed. The majority upsets this careful balance. I would affirm the Court of Appeals decision that Gail Winbun knew or should have known of her cause of action against Dr. Stephen Epstein long before her action was actually filed in superior court, and that her cause of action is barred under RCW 4.16.350.
The majority has recounted the facts of this case accurately. Winbun's perforated ulcer was misdiagnosed by her family physician in early 1993. This misdiagnosis continued even though Winbun was treated on April 17, 1993, in the emergency room (ER) at Highline Community Hospital; the ER physician misdiagnosed Winbun's condition as pelvic inflammatory disease. Seen again at the ER on April 19, 1993, the misdiagnosis continued even though Dr. Epstein, an obstetrician/gynecologist, assumed responsibility for Winbun's care. It was not until April 20, 1993, during emergency surgery, that Winbun's condition was properly analyzed. There is little question Winbun's subsequent hospitalization and posthospitalization disorders resulted at least in part from this improper diagnosis and treatment.
Candidly, it is difficult to see Dr. Epstein's actions here in a sympathetic light. Not only did he fail to properly diagnose Winbun's condition, he neglected to even come to the hospital to personally attend to Winbun, despite numerous calls from the hospital nursing staff. Dr. Epstein did not answer the calls because, for at least part of the time in question, he had turned off his beeper. But Dr. Epstein's obvious negligence must be considered in the context of the statute of limitations issue.
It is essentially undisputed in this case that the key events occurred April 17-20, 1993. We also know Winbun obtained some of her hospital records for April 17-20, 1993, in early 1994. While not her complete hospital file, the records clearly referenced Dr. Epstein's involvement in her case as treating physician, admitting physician, and surgical assistant.
Winbun, a former legal secretary, met with three sets of attorneys regarding a potential lawsuit. She met with Robert Gould on June 12, 1995. She told him to take no action. She ultimately gave him authority to proceed to investigate a medical malpractice claim on her behalf in January 1996. Gould sought the evaluation of a medical expert who opined that Winbun's family physician and the ER physician were negligent. Gould finally filed a lawsuit against those physicians and Highline Community Hospital on April 12, 1996, just one week before the three-year limitation period elapsed.
In the course of discovery in the case, Winbun herself testified she knew something was wrong with her treatment in April 1993; she felt "deep in my heart," "from the very beginning," negligence was involved. Report of Proceedings at 1143, 1149. She knew her family physician was negligent at least by June 1993.
Upon a suggestion from one of the hospital attorneys, attorney Gould sought an expert evaluation of Dr. Epstein's negligence in October 1996.[1] The expert evaluated Dr. Epstein's care of Winbun and described his negligence in no uncertain terms.[2]Within *586 three weeks (November 6, 1996), Gould was able to secure this expert opinion and amend Winbun's complaint to assert a malpractice cause of action against Dr. Epstein.
Classically, the discovery rule offers a special rule for the accrual of causes of action for purposes of a statute of limitations. The rule has generally been applied in professional negligence and product liability cases where an injured person cannot learn of one of the key elements of his or her cause of action until the normal limitation period had expired. See, e.g., Ruth v. Dight, 75 Wash.2d 660, 453 P.2d 631 (1969) (physician left sponge in patient's body during surgery and symptoms relating to sponge did not manifest themselves until after the traditional statute of limitations expired); White v. Johns-Manville Corp., 103 Wash.2d 344, 693 P.2d 687 (1985) (asbestosis is asymptomatic for a very long latency period; discovery rule is appropriate because plaintiff cannot know of injury until condition is symptomatic).
In the case of medical malpractice claims, the Legislature enacted RCW 4.16.350, which states in pertinent part:
Any civil action for damages for injury occurring as a result of health care which is provided after June 25, 1976 against: [a health care provider] ... based upon alleged professional negligence shall be commenced within three years of the act or omission alleged to have caused the injury or condition, or one year of the time the patient or his representative discovered or reasonably should have discovered that the injury or condition was caused by said act or omission, whichever period expires later, except that in no event shall an action be commenced more than eight years after said act or omission: PROVIDED, That the time for commencement of an action is tolled upon proof of fraud, intentional concealment, or the presence of a foreign body not intended to have a therapeutic or diagnostic purpose or effect, until the date the patient or the patient's representative has actual knowledge of the act of fraud or concealment, or of the presence of the foreign body; the patient or the patient's representative has one year from the date of the actual knowledge in which to commence a civil action for damages.
In effect, under RCW 4.16.350, the injured person has three years from the date of the negligence or one year from the discovery of the specified aspects of their case to act. The statutory discovery rule supersedes Ruth's common law discovery rule for medical malpractice cases. Gunnier v. Yakima Heart Ctr., Inc., 134 Wash.2d 854, 861-64, 953 P.2d 1162 (1998). Here, insofar as the commencement of the action against Dr. Epstein on November 6, 1996 is more than three years after the April 1993 events, the only aspect of RCW 4.16.350 at issue is the one year discovery rule period in the statute.
By its terms, RCW 4.16.350 provides an injured person must sue within one year of actually discovering (a) the person had an injury or condition (b) caused by (c) a health care provider's negligent act or omission. The cause of action is also barred if a suit is brought more than one year after the person "reasonably should have" discovered these factors; analyzed under an objective test.
As a matter of law, in fact, by her own admission, Winbun knew in early 1994 she had been the victim of medical malpractice and such malpractice was the cause of her consequent injuries and hospitalization. She and the majority contend, however, a plaintiff must effectively identify the person who caused the plaintiff's injury or condition before the plaintiff can be said to have discovered his or her cause of action. This has never been the law in Washington.
In Reichelt v. Johns-Manville Corp., 107 Wash.2d 761, 765, 733 P.2d 530 (1987), the plaintiff ultimately sued 28 asbestos manufacturers in 1980 for his injuries associated with asbestos exposure. Reichelt knew in 1971 he had asbestosis caused by exposure to asbestos products. He left his work due to asbestosis in 1974 and protested the closing of his industrial insurance claim in 1976 stating his understanding of the disease and his limitations. We held Reichelt should have known of his cause of action, as a matter of law, long before he filed his lawsuit, even though he did not know the identity of all the *587 manufacturers; we approved of the Court of Appeals disposition of the discovery rule issue:
That court [the Court of Appeals] further decided that Reichelt knew the identities of 14 of the 28 defendants by 1974, at the time he quit his job installing asbestos insulation. It also concluded that by the exercise of reasonable diligence, he could have determined the identities of the other manufacturers by October 20, 1977 and also could have ascertained whether their products reached him without substantial change.
107 Wash.2d at 771, 733 P.2d 530.
Under the discovery rule, the plaintiff's cause of action for medical malpractice accrues when the plaintiff knew or should have known the essential statutory elements articulated in RCW 4.16.350. Gevaart v. Metco Constr., Inc., 111 Wash.2d 499, 760 P.2d 348 (1988); In re Estates of Hibbard, 118 Wash.2d 737, 826 P.2d 690 (1992); Allen v. State, 118 Wash.2d 753, 826 P.2d 200 (1992). Under the objective prong of the test, the plaintiff "should have known" when he or she is placed on notice that the statutory elements are in place, and the plaintiff is charged with what a reasonable inquiry would have discovered at that time. As we recently stated in Green v. A.P.C., 136 Wash.2d 87, 96, 960 P.2d 912 (1998):
The general rule in Washington is that when a plaintiff is placed on notice by some appreciable harm occasioned by another's wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of the actual harm. The plaintiff is charged with what a reasonable inquiry would have discovered. "[O]ne who has notice of facts sufficient to put him upon inquiry is deemed to have notice of all acts which reasonable inquiry would disclose." Hawkes v. Hoffman, 56 Wash. 120, 126, 105 P. 156 (1909). Accord Enterprise Timber, Inc. v. Washington Title Ins. Co., 76 Wash.2d 479, 482, 457 P.2d 600 (1969); American Sur. Co. v. Sundberg, 58 Wash.2d 337, 344, 363 P.2d 99 (1961) ("notice sufficient to excite attention and put a person on guard, or to call for an inquiry is notice of everything to which such inquiry might lead."), cert. denied 368 U.S. 989, 82 S.Ct. 598, 7 L.Ed.2d 526 (1962).
In the present case, as a matter of law, Winbun knew of the statutory elements of her cause of action at least in early 1994. A reasonable inquiry as to her medical records or in consulting her retained expert would have revealed Dr. Epstein's egregious malpractice. Nothing prevented her from learning of her cause of action against Dr. Epstein.[3] As later proved to be true, the existence of Dr. Epstein's fault was easily and quickly ascertainable.
The policy argument for Winbun's failure to discover her claim against Dr. Epstein is unpersuasive. Winbun's inability to use the discovery process to obtain additional information regarding Dr. Epstein's negligence until after the three year limitation period had expired was entirely caused by Winbun's decision to await filing suit against the various defendants until the last few days of the limitation period. Winbun could have taken legal action at any time during the three-year period following her emergency surgery. Winbun's unwise decision to wait until just days before the limitation period expired does not excuse her failure to discover the necessary facts and sue the correct defendant(s) within the normal limitation period. "An injured claimant who reasonably suspects that a specific wrongful act has occurred is on notice that legal action must be taken." Beard v. King County, 76 Wash. App. 863, 868, 889 P.2d 501 (1995).
Winbun clearly knew in early 1994 that she had been injured as a result of medical malpractice. Winbun clearly knew that she needed to take legal action to protect her interests no later than early June 1995, when she met with attorney Gould. Winbun had specific notice from her own medical expert *588 that Dr. Epstein was a likely defendant in January 1996. If Winbun had been diligent in pursuing this case, she would have discovered the negligence of Dr. Epstein and brought suit against him well before the three-year limitation period elapsed.
The one-year discovery period in RCW 4.16.350 is intended to protect the claims of plaintiffs who do not know, and cannot immediately discover, they have a cause of action for medical malpractice. Until today, the rule has never been interpreted to apply to plaintiffs who sit on their known rights and fail to file suit until after the normal three-year period has expired. The Court of Appeals' application of RCW 4.16.350 adequately protects injured persons who do not know and cannot immediately discover that they have been injured by medical malpractice. The majority's holding serves only to excuse Winbun's failure to exercise the reasonable diligence required by this Court in Reichelt, 107 Wash.2d at 772, 733 P.2d 530, and Green, 136 Wash.2d at 96, 960 P.2d 912.
This case is difficult because Dr. Epstein is an unsympathetic defendant. Moreover, the jury was instructed on the statute of limitations and rendered a verdict in favor of the defendant. But our application of the law cannot be swayed by these facts. Under our traditional application of the discovery rule as mandated by RCW 4.16.350, Winbun's claim against Dr. Epstein was barred in April 1996, three-years after she was misdiagnosed and injured, and more than one year after she knew or should have known of all the statutory elements of her claim as a reasonable and diligent inquiry would have revealed.
I would affirm the decision of the Court of Appeals.
MADSEN, J., and GUY, J.P.T., concur.
NOTES
[1] The jury was instructed that Hill was negligent as a matter of law; Hill was found responsible for 40 percent of Winbun's damages. The jury found that Dr. Moore was negligent, but that her negligence was not a proximate cause of Winbun's damages. The jury also attributed contributory negligence to Winbun, but found that the plaintiff's negligence was not a proximate cause of her damages.
[2] The jury's Special Verdict Form included the following question:

QUESTION NO. 8: Did either Mr. or Mrs. Winbun and/or Mr. Robert Gould discover, or with due diligence reasonably should they have discovered, the factual basis of the essential elements of the Plaintiff's potential claim against Dr. Epstein prior to November 6, 1995?
Answer "yes" or "no."
Answer: No
Clerk's Papers at 345.
[3] The discovery rule provision of RCW 4.16.350 replaces the common law discovery rule announced in Ruth v. Dight, 75 Wash.2d 660, 453 P.2d 631 (1969). The statute also contains an eight-year repose period; this provision, however, was declared unconstitutional by this court in DeYoung v. Providence Medical Center, 136 Wash.2d 136, 960 P.2d 919 (1998).
[*] Justice Philip Talmadge is serving as a justice pro tempore of the Supreme Court pursuant to Const. IV, § 2(a) (amend.38).
[1] Dr. Robert Nielsen, Winbun's principal expert, concluded Dr. Epstein was negligent three months before the expiration of the three year limitation period provided in RCW 4.16.350. Dr. Nielsen sent a letter to Gould dated January 17, 1996 stating "even the gynecologist who took her to surgery did not examine the pelvis!" Clerk's Papers at 465. Dr. Nielsen subsequently testified he did not follow up on his opinion regarding Dr. Epstein's negligence because no one asked him to do so. Id.
[2] Another of Winbun's experts, Dr. Mize Connor, stated Epstein's negligence in clear terms in a declaration presented to the trial court on summary judgment. As the Court of Appeals noted:

Dr. Mize Connor [ ] stated that it was "inconceivable" to him how anyone could review Winbun's hospital records and not conclude that Dr. Epstein had breached the standard of care. Clerk's Papers at 455. At trial, Dr. Connor opined that "the level of negligen[ce] that Dr. Epstein exhibited here and his blatant, non-recognition for inquiry into the severity of Mrs. Winbun's illness makes this, I think, without question, a grossest case of failure to meet the standard of care that I have run across." Report of Proceedings at 118-19. Dr. Connor further opined that "[a] second year medical student would have been sent back to college had he written orders like this for a patient in Mrs. Winbun's condition." Id. at 89.
Winbun v. Moore, 97 Wash.App. 602, 607, 982 P.2d 1196 (1999) (alterations in original).
[3] Contrast the facts in this case with those of Lo v. Honda Motor Co., 73 Wash.App. 448, 869 P.2d 1114 (1994), relied upon by the majority, where plaintiff's counsel actively solicited the opinion of medical experts as to the cause of the plaintiff's injuries and virtually all the experts insisted Honda's automobile, not medical malpractice, was the cause of the plaintiff's injuries. Indeed, six physicians evaluated the case before a seventh concluded malpractice was present. Id. at 453, 869 P.2d 1114.