201 P.3d 1028 (2009)
Steven JAEGER and Susan Stevens-Jaeger, husband and wife, Appellants,
v.
CLEAVER CONSTRUCTION, INC., Eric and Jill Cleaver, Respondents.
And Related Cross-Claims and Counter-Claims.
No. 36540-5-II.
Court of Appeals of Washington, Division 2.
February 10, 2009.
*1031 David Alan Bricklin, Bricklin Newman Dold LLP, Devon N. Shannon, King County Prosecuting Attorney's Office, Seattle, WA, for Appellant.
Eric Brian Johnson, Law Offices of Eric Brian Johnson, Seattle, WA, for Respondent.
ARMSTRONG, J.
¶ 1 Steven Jaeger and Susan Stevens-Jaeger sued Eric and Jill Cleaver and Cleaver Construction, Inc. for negligence after three landslides damaged the high-bank waterfront property the Jaegers had purchased from the Cleavers. The jury awarded over $400,000 in damages to the Jaegers, but it apportioned 85 percent of the liability to the Jaegers for negligently contributing to the harm and failing to mitigate their damages. The Jaegers appeal, arguing principally that (1) the evidence was insufficient to support the jury's finding of contributory fault, (2) the trial court erred in instructing on contributory fault and mitigation of damages, (3) the trial court erred in not allowing the Jaegers to introduce evidence that their homeowners' insurance would not pay for interim repairs that might have mitigated the damages, and (4) the trial court should have granted a new trial on damages because of the jury's contributory negligence finding and its failure to award uncontested special damages. Finding no reversible error, we affirm.

FACTS[1]
¶ 2 The Jaegers' property sits on a high bluff overlooking Puget Sound. The bluff is broken up by three "benches": a "lower bench" 20 to 30 feet above the beach; an "intermediate bench" at about 200 feet; and an upper bench several feet above that. Report of Proceedings (RP) at 1291. The Jaegers' house is on the upper bench. The intermediate bench contains a "sports court." The intermediate bench is the site of the landslides at issue.

A. History

¶ 3 Eric and Jill Cleaver[2] purchased the property in 1990 as part of a large piece of vacant land. They engaged geologist Will Thomas to study the feasibility of developing the property into single-family plots. Thomas advised the Cleavers that the Department of Ecology had designated the property as "unstable and/or an old slide area," apparently where "local recent slides" had occurred. Ex. 7, at 5. Nonetheless, he found that the soil drainage was "reasonably good" and concluded that the property was "stable at this time." Ex. 7, at 5.
¶ 4 Thomas recommended installing a drainage system that included subdrains at the exterior of foundation walls, and diverting all surface and roof water to the beach via tightline pipes. He also recommended that the Cleavers "[p]lant and maintain vegetation on bare slopes." Ex. 7, at 8. Thomas emphasized that "the primary culprit causing earth movement on slopes is water and/or over-excavating." Ex. 7, at 8. Therefore, proper construction practices and control of drainage were "essential" to minimize potential problems. Ex. 7, at 8.
¶ 5 The Cleavers subdivided the property into three lots, A, B, and C, and installed a drainage system that served all three lots together. Specifically, all water collected on Lot A was sent to a catch basin (known in this litigation as the "vault") in the northwest corner of Lot B, then transported north through Lot B to a utility ditch alongside the access road on the west side of the properties.
¶ 6 On Lot A, the property at issue, Eric built a house on the upper bench, which the Cleavers lived in until 2001. While Eric was building the house, unexpectedly wet weather arose before he had the storm drainage system in place. To get the water away from the house, Eric placed a diversion pipe at the southeast corner of the framed house, which *1032 drained water into a vegetated area off to the side. The pipe was not intended to be permanent, but Eric never removed it. It led south onto property that is now owned by Mark Bissonette.
¶ 7 Once completed, the drainage system surrounding the house consisted of two sets of drains: (1) footing drains, which were perforated pipes lined with gravel, designed to pick up groundwater from under the house and (2) "tightline" pipes that collected surface water from exterior yard drains and down spouts. A "tightline" pipe is not perforated; it carries the water all the way to its destination before discharging it. Both sets of pipes took water to the vault on Lot B.
¶ 8 In 1993 or 1994, Eric built the sports court on the intermediate bench. First he built a rock wall along the steep face separating the upper and intermediate benches. Then he leveled the surface for the sports court by adding a layer of "fill" soil. The sports court sloped slightly west toward a catch basin drain that Eric installed in the middle of the western edge of the slab, toward the rock wall and away from the slope. The catch basin was designed to collect water both from the sports court surface and from a drain in the bottom of the rock wall. A sump pump in the bottom of the catch basin pumped the water northwest (uphill) to the vault on Lot B. The pipe to the vault had a "check valve" in it, which prevented water from flowing backwards from the vault to the sports court.
¶ 9 In 1999, the Cleavers sold Lot B to Gregory and Marguerite Norbut, who hired Eric's company, Cleaver Construction, Inc., to design and install their septic system. While using a backhoe to install the system, Cleaver Construction's operator damaged the underground pipe that transported water north from the vault. The pipe was crushed to 25 percent of its original capacity and had a hole in the bottom of it. No one knew of the damage at the time.
¶ 10 In May 2001, the Cleavers sold Lot A to the Jaegers. In December 2001, Eric came out to the property to show Susan Jaeger the drainage system and explain how it worked. Eric specifically told her that in the fall, the sump pump in the sports court catch basin could get clogged with leaves. He warned her that "you didn't want water on the court ... you want to watch this." RP at 24.
¶ 11 Within the first few months on the property, Susan cleared the native shrubs from the intermediate slope and planted it with grass.
¶ 12 Several properties in the area, including Lots A and B, had a well-sharing agreement that Scott Hansen managed. Every few months, Hansen sent each member copies of the water usage readings for all the participating lots. After the Jaegers moved onto Lot A, the Norbuts discovered that the Jaegers used significantly more water than any other lot in the subdivision. The neighbors discussed it, and on February 17, 2002, Hansen wrote the Jaegers that their water use was high and they might want to check their system for possible leaks. The water use on Lot A did not go down; in fact, it was often substantially higher over the next several years.

B. The 2001 Slide

¶ 13 In late 2001, the region experienced unusually heavy rains. The November 2001 rainfall was almost twice as high as usual, and the December rainfall was about one third more than usual.
¶ 14 On November 23, 2001, the Jaegers also had ground water flowing into their septic system on the western side of the property because a sump pump serving the system failed. The water was coming from the access road to the west of the Jaegers' house and, because the sump pump was not working, the water was going into the Jaegers' septic system and drain field. The drain field was on the west side of the house, uphill from the sports court.
¶ 15 On December 17, 2001, a landslide occurred to the east of the sports court; the land dropped up to 22 inches. The sump pump in the sports court had failed, so the sports court was covered with a pool of water. When Susan removed the failed sump pump, it had a "black gummy material" inside. RP at 1745. In addition, the vault on Lot B was full to the brim, suggesting that *1033 the discharge line going north from it was blocked. The Jaegers pumped water out of the vault to the west with a hose. When this pump occasionally stopped working, the vault overflowed.
¶ 16 Susan immediately hired Bruce Reynolds, a geologist with the geotechnical consulting firm of Shannon & Wilson, to inspect the site and make recommendations. On January 9, 2002, Reynolds wrote a report, which concluded that the slide was caused by the sump pump's failure to remove water accumulating on the sports court surface. He thought that the slide was "shallow," involving only "the surficial 3 to 4 feet of weathered and/or fill soils that mantle the slope west of the top of the steep bluff." Ex. 11, at 5.
¶ 17 Reynolds recommended: (1) replacing the sports court catch basin and its sump pump; (2) installing a trench subdrain across the western portion of the intermediate bench to direct water to the beach if the sump pump failed again; (3) obtaining an as-built drawing of the drainage system from Eric, locating all drainage pipes, catch basins, and outfalls for the Jaeger and Norbut properties; (4) separating the Jaeger drainage system from the Norbut property, i.e., design a new suitably sized but independent drainage system; (5) replacing lost soil under the sport court slab with styrofoam blocks; (6) planting the area with rapidly growing plants with moderately deep root structures (he proposed Sitka Willow, vine maple, and salmonberry); and (7) cutting down a moderately sized maple tree, leaving the stump. He advised that if the slide damage approached the house over time, additional measures, such as a retaining wall, could be necessary.
¶ 18 The Jaegers did not implement all of Reynolds's recommendations. Instead of installing a trench drain as Reynolds specified, Susan got Reynolds to approve installing an overflow drain into the catch basin, which ran out toward the beach. She also did not separate her site drainage from Lot B because the communal system was written into the short plat for the property. As to replanting the slope, Susan asked Reynolds if she could keep the grass she already had. Reynolds acquiesced because he thought they might soon be doing major repairs in the area that would destroy the new plants anyway. Susan also could not obtain an as-built drawing of the drainage system because Eric had never made one.
¶ 19 On her own, Susan installed a trench drain on the east side of the sports court. The trench was about the width of the sports court and about three feet deep. This depth did not extend to the bottom of the "fill" layer of soil.
¶ 20 In the summer of 2002, Susan hired an engineering consulting firm, URS Corporation, to investigate the drainage system, starting with the blocked pipe on the Norbuts' property. With the help of civil engineer Marty McCabe, the Jaegers excavated the pipe, which was crushed, punctured, and clogged with clay soil, and fixed it.

C. The 2003 Slide

¶ 21 On March 1, 2003, a few days before the Jaegers dug up the damaged pipe, the southeast part of the intermediate bench again slid. This slide was smaller than the first, but the ground dropped up to three feet. The slide also "slumped" the trench drain Susan had placed east of the sports court so that it held water in the slope instead of draining it. RP at 76.
¶ 22 In July 2003, the Jaegers sued Cleaver Construction and the Cleavers individually for, among other claims, negligently damaging the drain pipe with the backhoe.[3] The trial court denied the Cleavers' motion for *1034 summary judgment as to Eric's individual liability, finding an issue of material fact as to whether Eric was personally involved in installing the Norbuts' septic system.
¶ 23 The Jaegers did not notify Reynolds about the March 2003 slide until August of that year. When he again viewed the site, Reynolds concluded that a retaining wall was necessary to protect the sports court and the house. He sent the Jaegers a proposal to take soil borings and create topographic surveys of the site for the purpose of recommending engineering designs. Susan declined to proceed with soil borings because she could not pay for a retaining wall at the time. Instead, she asked for cost estimates of potential retaining wall designs, which Reynolds provided in November 2003. One wall proposal was $104,000, and the other was $244,000.
¶ 24 Meanwhile, McCabe was working with Susan to prepare drawings of the overall drainage system on the Jaegers' property "from scratch." RP at 62. The process took "several years" because they "did certain parts of the investigation at certain periods of time." RP at 891. For the first year or two, either McCabe or Susan would measure the depth of drains they could see and then run video cameras through the pipes to ascertain where they went. After August 2004, they also excavated certain pipes near the house to see how they worked. Because of one of those excavations, the Jaegers replaced all of the footing drains around the house; they had been surrounded by a silty material that prevented them from absorbing groundwater as intended. Over the course of McCabe's investigation, his opinion as to the cause of the 2001 slide changed several times.
¶ 25 In June 2005, Susan consented to taking soil borings in preparation for litigation. The borings showed that the soil was much more vulnerable than any experts had previously thought. Specifically, it was affecting not only the top layer of fill material, but also native materials underneath. Reynolds estimated the depth of the slide zone at eight to ten feet.

D. The 2006 Slide

¶ 26 In January 2006, rainfall in the region was again more than double the normal amount. It was also one-third more than normal in December 2005. On February 3-4, 2006, a major landslide occurred on the same intermediate slope. The ground dropped from 6 to 8 feet on the north side of the sports court, and 15 to 20 feet on the south side. Both Reynolds and McCabe concluded that the more substantial retaining wall was necessary at that point.

E. Evidentiary Motion

¶ 27 At the beginning of trial, the Cleavers moved to exclude certain testimony regarding the Jaegers' homeowners' insurance. The testimony would have been that one of the reasons the Jaegers did not have the money to build the retaining wall quickly was that their homeowners' insurance policy did not cover it. The trial court granted the Cleavers' motion to exclude this testimony.

F. Trial

¶ 28 The parties litigated two main issues at trial. The first was identifying the cause of the 2001 slide, and the second was the reasonableness of the Jaegers' mitigating efforts afterwards.

1. Causation
¶ 29 The Jaegers sought to prove that the Cleavers caused the 2001 slide, which undermined the stability of their slope and therefore caused the 2003 and 2006 slides as well. Their theory was that because the northbound pipe on Lot B was blocked, water backed up from the vault and caused the sump pump in the sports court to burn out from overwork. Without the sump pump to remove surface water from the sports court, the water soaked into the slope and caused the slide. The Jaegers also claimed that the backed-up water from the vault discharged into the slope through (1) the pipe at the southeast corner of the house and (2) perforated footing drains along the east side of the house.
¶ 30 The Cleavers disputed both claims. They contended the sports court sump pump *1035 was clogged with decaying fall leaves and other organic material. This "black gummy material" caused the pump to fail, and Eric had warned the Jaegers of the importance of keeping the pump cleaned out. RP at 1745. Eric also testified that in 2003, Susan admitted to him, "I know you told me to maintain that sump pump. I didn't. I wish I had." RP at 1746. Eric also testified that the sump pump would not have burned out from backflow water pressure.
¶ 31 Engineering geologist Jon W. Koloski testified that although the sump pump's failure was a "trigger" for the 2001 slide, the primary cause was the unusual amount of groundwater flowing through the property at the time. RP at 1302. The groundwater came both from recent heavy rainfall and from the Jaegers' septic drain field to which the Jaegers' high water usage was discharged. The sump pump failure, meanwhile, caused rainwater to pool on the west side of the sports court, which soaked into the ground at the bottom of the rock wall and added to the groundwater to saturate the slope.
¶ 32 Koloski also testified that the backed-up water from the vault would not have flowed onto the sports court. The experts agreed that water will always flow downhill, so determining where it has gone requires assessing the elevations of various drainage openings. Norbut testified that after the 2001 slide, the vault overflowed when it was not being pumped out. But the elevation of the vault's rim was higher than the sports court or any other drain on the Jaeger property, so the water could not have been discharging from any of those drains. In other words, the water must have poured out of the top of the vault because it had nowhere else to go.
¶ 33 The defense presented other evidence of how the Jaegers contributed to the slides. First, Koloski testified that the Jaegers' initial clearing of vegetation on the slope was a "quantifiable cause" of the 2001 slide. RP at 1445. Koloski testified that vegetation provides various levels of protection. First, the root structures lend structural strength to the soil and drink up water from it. Second, rainfall hits the plants first, which protects the soil from much of its force. The Jaegers' neighbors on either side, Norbut and Bissonette, both testified that they considered maintaining ample vegetation on their slopes to be critical and were concerned when they saw the Jaegers removing it.
¶ 34 Koloski also criticized the trench drain that Susan and her landscaper had constructed below the sports court. Not only was the drain too shallow, making it ineffective, but it was not attached to anything solid and thus could be easily moved by the slope to a position where it was actually holding water in the slope. This added pressure and weight on the slope would have contributed to subsequent slides. In addition, the drain pipe away from the trench was perforated, which meant that water could drain into the slope and contribute to its saturation.

2. Failure to Mitigate Damages
¶ 35 Koloski testified that the 2001 slide could have been effectively repaired at the time and the 2003 and 2006 slides prevented at a cost of less than $50,000. The Jaegers could have replaced the fill soil under the sports court and reinforced it for $10,000-$20,000. For another $20,000, they could have installed the various drainage improvements and re-landscaping Reynolds suggested in his 2002 report.
¶ 36 Koloski believed that the retaining walls McCabe and Reynolds recommended would have restored and made the sports court more secure than it was before the 2001 slide. Further, Koloski testified that, if a retaining wall had been necessary to return the slope to its pre-2001 condition, he had designed one that the Jaegers could have built for $37,500.

3. Jury Instructions
¶ 37 The Cleavers proposed jury instructions on the Jaegers' contributory negligence and failure to mitigate damages. The Jaegers objected to the failure to mitigate instruction, arguing that the evidence was insufficient to support the defense. As an alternative to omitting the mitigation of damages instruction, the Jaegers proposed an *1036 amended instruction that included the following language:
If a choice of two reasonable courses presents itself, the injured person is entitled to choose either one. To the extent that the decision on how to respond requires special training, education or experience, the injured party's duty to exercise ordinary care to avoid or minimize damages is satisfied if the person reasonably relies on the advice given by a person who has that special training, education or experience.
Clerk's Papers (CP) at 351 (emphasis omitted). The trial court did not give the above instruction; instead, it instructed the jury that the Cleavers claimed the Jaegers were contributorily negligent in failing to act reasonably to mitigate their damages.[4]
¶ 38 The Jaegers also objected to the instructions concerning their alleged contributory negligence as a cause of their damages, arguing that the evidence did not warrant those instructions either. The trial court overruled this objection.

4. Verdict
¶ 39 The jury found that the Jaegers had incurred damages of $438,112, including (1) $10,612 in past remedial expenses, (2) $315,000 in future remedial expenses, (3) $25,000 for loss of use and enjoyment of the property, (4) $80,000 for loss of property value, and (5) $7,500 in additional insurance premium expense. The jury also found that the Jaegers' own negligence was a proximate cause of their damages, attributing 85 percent of the damage to the Jaegers.
¶ 40 The verdict form did not ask the jury to apportion any of the fault to Eric individually. Rather, the jury instructions most often referred to a singular "defendant" as opposed to plural "defendants," without objection from either party. When entering the judgment, the trial court omitted Eric as a judgment debtor, entering judgment against only Cleaver Construction in the amount of $65,716.80.

G. Post-Trial Motions

¶ 41 The Jaegers moved for (1) judgment as a matter of law or a new trial on the issue of contributory negligence, (2) an additur of certain past and future remedial expenses and housing and travel expenses, and (3) amendment of the judgment to include Eric as a judgment debtor. The trial court denied the motion.

ANALYSIS

I. Contributory Fault
¶ 42 The Jaegers assert that the evidence was insufficient to support the jury's finding of contributory negligence. Two theories of contributory fault are at issue: (1) that the Jaegers negligently caused their own damages and (2) that the Jaegers failed to mitigate those damages.[5]

A. Contributory Negligence

¶ 43 A claimant is contributorily negligent if he fails to exercise the care for his own safety that a reasonable person would have used in the same situation. Rosendahl v. Lesourd Methodist Church, 68 Wash.2d 180, 182, 412 P.2d 109 (1966). Even a negligent plaintiff who did not directly cause the accident may be held liable for more of the damages claimed than the accident-causing tortfeasor. Geschwind v. Flanagan, 121 Wash.2d 833, 839, 854 P.2d 1061 (1993).
¶ 44 We review a jury verdict in a civil case to determine whether sufficient evidence supports it. Winbun v. Moore, 143 Wash.2d 206, 213, 18 P.3d 576 (2001) (quoting Adcox v. Children's Orthopedic Hosp. & Med. Ctr., 123 Wash.2d 15, 35, 864 P.2d 921 *1037 (1993)). The record must contain a sufficient quantity of evidence to persuade a rational, fair-minded person of the truth of the premise in question. Winbun, 143 Wash.2d at 213, 18 P.3d 576. But where "[r]easonable minds could differ" on the question, we will not overrule the jury's decision. See Winbun, 143 Wash.2d at 217, 18 P.3d 576. Assessing the contributory fault in an action for negligence is generally a factual question for the jury. See Bauman v. Crawford, 104 Wash.2d 241, 244, 704 P.2d 1181 (1985).
¶ 45 The Cleavers advanced several theories as to how the Jaegers negligently caused, at least in part, the 2001 slide. First, they contended that the Jaegers were responsible for the sump pump failure because they let it become clogged with leaves and other organic matter. According to Eric, Susan admitted this when she told him in 2003, "I know you told me to maintain that sump pump. I didn't. I wish I had." RP at 1746. And Koloski testified that the pump failure triggered the 2001 slide.
¶ 46 The Cleavers also claimed that the Jaegers negligently used too much water for their septic system. The Cleavers introduced evidence that a neighbor had warned the Jaegers about such use but the Jaegers did not cut back. The excess water ended up in the Jaegers' drain field. Koloski testified that groundwater was the primary cause of the slide activity on the Jaegers' slope and that water from their drain field augmented the already large amount of natural groundwater.
¶ 47 The Cleavers also pointed to the Jaegers' initial clearing of vegetation on the slope. Given the benefits of vegetation described by Koloski and the concerns of the neighbors who were experienced with slides in the area, the jury was entitled to find that the Jaegers were negligent in removing the well-established plants on the slope. And Koloski testified that this removal of the vegetation was a "quantifiable cause" of the 2001 slide. RP at 1445.
¶ 48 The evidence of contributory negligence was sufficient to support the jury's verdict of 85 percent fault.[6] It follows that the court did not err in instructing the jury on contributory negligence as a cause of the original harm.[7]

B. Failure to Mitigate Damages

¶ 49 The doctrine of avoidable consequences, or mitigation of damages, prevents an injured party from recovering damages that the party could have avoided through reasonable efforts. Labriola v. Pollard Group, Inc., 152 Wash.2d 828, 840, 100 P.3d 791 (2004); 16 David K. DeWolf and Keller W. Allen, Washington Practice: Tort Law & Practice § 8.9, at 261 (3d ed.2006). Courts allow a wide latitude of discretion to the person who, by another's wrong, has been forced into a predicament where he is faced with a probability of injury or loss. Labriola, 152 Wash.2d at 840, 100 P.3d 791 (quoting Hogland v. Klein, 49 Wash.2d 216, 221, 298 P.2d 1099 (1956)). If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that the injured party chose one over the other. Labriola, 152 Wash.2d at 840, 100 P.3d 791 (quoting Hogland, 49 Wash.2d at 221, 298 P.2d 1099).

1. Substantial Evidence
¶ 50 The jury could have concluded that the Jaegers made several unreasonable choices in dealing with the landslides on their property. After the first slide, they bargained with Reynolds on two of his remedial recommendations: re-vegetating and installing the trench drain on the slope. And although the Jaegers testified that Reynolds approved the already planted grass as an alternative, he did so only because he thought they would be doing additional work in the area anyway. Moreover, obtaining Reynolds's approval for the substitute did *1038 not insulate the Jaegers from any adverse result. The jury could have found that the Jaegers should have known that planting grass was not as beneficial as planting the deeper-rooted plants Reynolds originally recommended, particularly because the recommended plants were similar to the original plants that they had removed and which had previously kept the bank stable.
¶ 51 Reynolds also did not recommend the trench drain the Jaegers installed, which was too shallow to be effective. Ultimately, this drain failed and held water in the slope, rather than draining it off.
¶ 52 Moreover, when the 2003 slide occurred, the Jaegers did not consult Reynolds about it until five months afterwards. They also refused to allow experts to take soil borings to assess the damage until 2005, four years after the initial damage was done. In the meantime, the Jaegers did not plant any vegetation on the slope; instead, they kept it covered with plastic so that nothing could grow. Robert Cousins testified that the slope was like a "freight train that will keep going down the hill" unless the Jaegers promptly implemented corrective measures. RP at 1724. The Jaegers' reason for the delay was that they needed to get the money for the retaining wall through litigation, but the jury may have seen this as an unreasonable strategy, given the relatively low cost of re-planting the slope.
¶ 53 Koloski also testified that the Jaegers could have used a relatively inexpensive method of restoring the property to its original stability. The jury was entitled to conclude that the Jaegers should have explored other remedies. Overall, the evidence of the Jaegers' failure to mitigate their damages was sufficient.[8]

2. Jury Instructions
¶ 54 The Jaegers also challenge the trial court's decision not to give the jury their proposed mitigation of damages instruction. The instruction provided that (1) if an injured party is presented with two reasonable courses of action to mitigate his damages, he is entitled to choose either one and (2) if the decision requires special training, education, or experience, the injured party satisfies his duty to mitigate his damages if he reasonably relies on an expert's advice. The Jaegers concede that there is no Washington authority to support the latter instruction.
¶ 55 A trial court has considerable discretion in deciding what specific instructions to give. Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 165, 876 P.2d 435 (1994)); Gammon v. Clark Equip. Co., 104 Wash.2d 613, 617, 707 P.2d 685 (1985). A trial court does not abuse its discretion if the instructions given allow each party to argue his or her theory of the case; it is under no obligation to give misleading instructions, or instructions that are not supported by authority. Salas v. Hi-Tech Erectors, 143 Wash.App. 373, 386, 177 P.3d 769 (2008); see Gammon, 104 Wash.2d at 617, 707 P.2d 685. We will reverse only where the trial court abuses its discretion in a way that prejudices the complaining party. See Herring v. Dep't of Soc. & Health Servs., 81 Wash.App. 1, 23, 914 P.2d 67 (1996).
¶ 56 The trial court did not abuse its discretion here. The Jaegers could argue from the general instructions that they satisfied their duty to prevent further harm because the course of action they chose was reasonable; nothing in the instruction required the chosen course to be the best option. The instruction regarding expert recommendations is superfluous in addition to being unsupported by Washington law, and would be difficult to apply because of the nature of some of the experts' "recommendations." For example, Reynolds originally advised the Jaegers to plant moderately deep-rooted plants. The Jaegers negotiated with him to approve substituting the existing grass. Reynolds agreed to this only because he believed they would be doing other work in the area. In other words, he approved the substitution as a temporary solution. Similarly, the Jaegers did not proceed with soil borings for two years after Reynolds's initial *1039 recommendation because they were waiting for money from litigation; while Reynolds also acquiesced to this delay, he did not recommend it as the instruction would suggest. Under these circumstances, the instruction is more confusing than helpful, and the trial court did not abuse its discretion in omitting it.

II. Substantial Justice
¶ 57 The Jaegers argue that the trial court should have granted their motion for a new trial for the reasons stated above and also because substantial justice has not been done. See CR 59(a)(9). Their argument on the latter ground focuses primarily on their unfortunate financial situation because the property is now unsuitable for residential use or sale.
¶ 58 Courts rarely grant a new trial for lack of substantial justice under CR 59(a)(9) because of the other broad grounds afforded under this rule. Lian v. Stalick, 106 Wash. App. 811, 825, 25 P.3d 467 (2001). Here, the evidence provided a legitimate basis for the jury to conclude that the Cleavers' negligence was only a small contributor to the Jaegers' damages. Under these circumstances, the Jaegers' plight is not grounds for a new trial.

III. Additur
¶ 59 The Jaegers argue that the trial court erred in denying their motion for additur of certain past and future remedial expenses.
¶ 60 Determining the amount of damages is within the jury's province, and courts are reluctant to interfere with a jury's damage award. Locke v. City of Seattle, 162 Wash.2d 474, 486, 172 P.3d 705 (2007) (quoting Palmer v. Jensen, 132 Wash.2d 193, 197, 937 P.2d 597 (1997)). Nonetheless, RCW 4.76.030 allows an additur where (1) the trial court finds that a new trial would be appropriate because the damages are "so excessive or inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice," and (2) the adversely affected party consents to an increase in the verdict as an alternative to a new trial. See Green v. McAllister, 103 Wash.App. 452, 462, 14 P.3d 795 (2000). The Jaegers meet neither requirement; the trial court properly denied the Jaegers' motion for a new trial, and Cleaver Construction did not consent to an increase in the verdict. Consequently, the trial court lacked authority to grant an additur.

IV. Evidence of Lack of Insurance Coverage
¶ 61 The Jaegers contend that the trial court erred in excluding evidence that their homeowners' insurance would not cover the cost of a retaining wall, arguing the evidence was relevant to the Cleavers' claim that they failed to mitigate their damages. The Cleavers respond that they did not argue that the Jaegers should have built an expensive retaining wall; rather, they argued that the Jaegers should have found a cheaper way to stabilize the ground.
¶ 62 We review a trial court's evidentiary rulings for abuse of discretion. Univ. of Wash. Med. Ctr. v. Dep't of Health, 164 Wash.2d 95, 104, 187 P.3d 243 (2008). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons, i.e., if the court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on a legal error. State v. Lord, 161 Wash.2d 276, 283-84, 165 P.3d 1251 (2007).
¶ 63 As a preliminary matter, the Jaegers are correct that ER 411 does not apply here because the proposed testimony was not about liability insurance. Their concern that the jury assumed that they did have insurance to cover their damages, however, is unfounded. The Cleavers presented no evidence to rebut the Jaegers' testimony that they lacked the funds to build a retaining wall. In addition, the trial court permitted the Jaegers to introduce testimony that their homeowners' insurer refused to renew their policy in 2002 because of the slide activity on the property. Thus, nothing in the record suggests that the Jaegers had insurance coverage for a retaining wall. The trial court *1040 did not abuse its discretion in excluding the evidence that the policy did not cover it.

V. Amendment of Judgment
¶ 64 Finally, the Jaegers argue that the trial court erred in denying their motion to amend the judgment to include Eric individually as a judgment debtor. The record does not tell us why the trial court omitted Eric from the judgment, but both parties approach the issue as whether the evidence supported a verdict against him.
¶ 65 The jury was not asked to decide whether Eric was individually liable. In fact, the verdict form did not ask the jury to assess liability against any defendant, only to attribute a percentage of the negligence to the Jaegers. The trial court had previously held that a genuine issue of material fact existed as to Eric's personal involvement in Cleaver Construction's design and installation of the Norbut septic system. Thus, the Jaegers were entitled to submit the question to the jury, but they did not request such a submission. In fact, even the Jaegers' proposed jury instructions would have told the jury that "Eric and Jill Cleaver are named as defendants only in their role as representatives of Cleaver Construction, Incorporated," not as independent tortfeasors. CP at 323 (emphasis added). The Jaegers either misunderstood or abandoned their claim for Eric's individual liability. The trial court did not err in omitting the individual Cleavers from the judgment as judgment debtors.
¶ 66 Affirmed.
We concur: HOUGHTON, P.J., and HUNT, J.
NOTES
[1] Most of the issues here require us to review the facts in the light most favorable to the Cleavers.
[2] Where necessary, we refer to the Jaegers and Cleavers by their first names for clarity. We intend no disrespect.
[3] The litigation did not begin with the Jaegers' suit against Cleaver Construction. Initially, it was the Norbuts who sued the Jaegers for (1) trespass by the drain pipe running across their property from Lot A and (2) negligent maintenance of the sports court, which resulted in a loss of lateral support to their property. The Jaegers counterclaimed for damage caused by the negligent installation of a septic system on the Norbuts' property. Because it was Cleaver Construction that installed that septic system, the Norbuts joined claims of breach of contract and breach of warranty against Cleaver Construction. The Jaegers then added several cross claims against Cleaver Construction, one of which is the subject of this appeal. All other claims were eventually dismissed or settled.
[4] The parties discussed instructions in chambers, but the Jaegers did not state on the record their objections to the court's handling of the mitigation of damages instructions. Thus, we do not know the court's reasons for instructing as it did.
[5] The Jaegers also argue that the evidence of contributory negligence and mitigation of damages was insufficient to instruct the jury on these defenses. Because this argument is subsumed in the question whether the evidence supports the jury's findings on these defenses, we do not discuss it separately. We do separately address the Jaegers' argument that even if there was evidence of contributory negligence, it does not support allocating 85 percent to them.
[6] And accordingly, the trial court did not err in denying the Jaegers' motion for judgment as a matter of law on this basis.
[7] A party is entitled to have the jury instructed on his or her theory of the case if the evidence supports the theory. Ramey v. Knorr, 130 Wash. App. 672, 688, 124 P.3d 314 (2005) (citing Hizey v. Carpenter, 119 Wash.2d 251, 266, 830 P.2d 646 (1992)).
[8] This conclusion also requires us to affirm the trial court's denial of the Jaegers' motion for judgment as a matter of law.